# Holley v. The State.

## Indictment for Murder.

1. *Indictment; signature of solicitor.*—The signature of the solicitor, with a designation of his circuit, is proper, but not essential to the authentication or sufficiency of an indictment; and where, in the absence of the solicitor for the circuit, an attorney is temporarily acting in that capacity, under the appointment of the court, his signature to an indictment, with the designation of " solicitor pro tem.," is proper.

2. *Murder; admissibility of evidence.*—On the trial of a defendant indicted for murder, the vest worn by the deceased at the time he was killed, and perforated by the shot, may be produced and exhibited to the jury.

3. *Charge to the jury; when free from error.*—Reading to the jury, as part of the court's general charge, extracts from reported decisions of this court, accompanied with instructions adapting them to the particular case, is free from error.

4. *Murder; when charge misleading.*—On the trial of a defendant indicted for murder, a charge requested by him embodying the instruction that he can not be convicted of murder in the first degree, " *unless he had murder in his heart,*" having a tendency to confuse and mislead the jury, is properly refused.

5. *Same; self-defense.*—To authorize, on the trial of a defendant indicted for murder, instructions touching the law of justifiable homicide, there must be evidence tending to show that there was, in fact, or the circumstances generated a reasonable belief of, the existence of a present, imperious necessity, not resulting from the wrongful act of the defendant, for him to take the life of the deceased, to avoid the loss of his own life, or to avoid grievous bodily harm; and when there is no such evidence, such instructions are abstract, and, for that reason, properly refused.

6. *Same; when charge on law of self-defense properly refused.*—It is not an honest, but a reasonable belief of a necessity to take life, that will justify a homicide; and hence, a charge requested by a defendant on trial for murder, instructing the jury that if they believe from the evidence, that the defendant, at the time he fired the fatal shot, *honestly* believed that it was necessary for him to kill the deceased, etc., they must acquit, is properly refused.

7. *Murder in first degree; meaning of malicious as used in statute.* While the term *malicious*, as it is used in the statute defining or describing murder in the first degree, is construed as signifying a killing perpetrated with a fixed hate, or with wicked intentions, or motives, not the result of sudden passion, this fixed hate or wicked intentions or motive may be instantaneous, and of it there need have been no previous manifestation.

. 8. *Failure to write "given" on charge given at defendant's request; can not be taken advantage of on motion in arrest of judgment.*—The omission of the presiding judge to write "given" upon instructions requested by the defendant in a criminal case, and given to the jury, as required by the statute, is not an error of which advantage can be taken on a motion in arrest of judgment.

[Holley v. The State.]

Appeal from Tuscaloosa Circuit Court.

Tried before Hon. John Moore.

Scip Holley, the defendant in the court below, appellant here, was indicted for the murder of Luther Sealley, and was convicted of murder in the first degree, and sentenced to be hung.

The only eye-witness to the killing examined on behalf of the State, so far as disclosed by the bill of exceptions, was Howard Sealley, the father of the deceased, whose testimony was, in substance, as follows: On the 19th January, 1884, between eleven and twelve o'clock in the forenoon, the deceased received a gun-shot wound, " the gun at the time it was fired being in the hands " of the defendant, and from the effects of this wound he shortly afterwards died. The defendant had lived on the witness' plantation, in Tuscaloosa county, during the year 1883, from which he was preparing to move on the morning of the killing. George Sealley, another son of witness, had charge of this plantation, hired the hands, etc., but did not live thereon; and at the time of the killing the defendant was indebted to the said George, who had requested his father to collect said indebtedness from defendant. About eight o'clock on the morning of the killing, witness saw defendant, and told him that he must pay George Sealley before moving, or leave his gun, which he then had with him, as security, or else he could not move his things off the place. Defendant replied: "I won't do it. I'll go to Squire Parks [a justice of the peace] and get my things," and then left, carrying his gun with him. In two or three hours defendant went to his house on the place, the witness following him. At the time, a wagon, loaded with defendant's "things," was standing in front of the house, and the defendant ordered the driver to drive off. To this witness objected, telling defendant that he could not move his "things" until he paid what he owed George, or left his gun as security for it. About this time Luther Sealley "came up for the first time," and said to the defendant, "Scip, leave the gun, or wait until George comes." When Luther commenced talking to him, the defendant changed the position of the gun, cocked it and held it in front of him, with the barrels resting across his left arm, and holding by his right hand, so that the butt of the gun extended under his right arm. The defendant having replied, "I won't do it," walked off, carrying his gun in the same position. After he had gone about thirty-five steps Luther called him and told him to stop a moment. Defendant stopped, and turned partly around towards Luther, who was walking towards him. "Luther walked up to within about two feet of him, remonstrating with him, and said to him,

'Scip, leave the gun and go and get the money and settle the matter.' Defendant replied, 'I won't do it,' and immediately shot him. Luther threw his hands up to his side, and said, 'He has killed me.' Before the shooting, neither the witness nor Luther said an angry word, or spoke in an angry manner or tone to the defendant." The defendant's tone, however, when spoken to about leaving the gun, was that of an angry man. The testimony of this witness further tended to show that there had been no quarrel between the parties; that the gun was loaded with small shot; that Luther made no threat, nor did he attempt to take the gun from the defendant; and that when defendant started off, immediately preceding the killing, "he said he was going to get the money to pay George." During the examination of this witness, he was asked by the solicitor for the State, "In what part of the body was Luther Sealley shot." The witness then produced a vest, which, he testified, was the vest worn by Luther Sealley when he was shot, and held it so the jury could see it, and pointed out to them the hole therein, which, he said, was made by the shot. The defendant objected to the witness being permitted to exhibit the vest to the jury for said purpose; but the court overruled his objection, and he excepted. It was also shown on behalf of the State, that as soon as the gun fired, the defendant walked off some little distance, and then began to run, and "ran as far as he was seen."

The only evidence offered on behalf of the defendant was a showing for a continuance as to what one Wash Stewart would testify, the contents of which were substantially as follows: That said witness was present at the killing and saw the shooting; that at the time the shooting occurred, the defendant had the butt of his gun under his arm; "that deceased was advancing on defendant to take defendant's gun away from him, and the defendant was stepping backwards, and trying to keep out of his reach; and that the gun was fired accidentally, and was discharged without being elevated or changed from its position;" that the defendant was moving that morning and carried his gun with him before he had any controversy with any one; that the gun would go off "half-cocked," and could in that way be discharged; that defendant did not appear to be angry when the shooting occurred, and seemed greatly alarmed after the fatal shot was fired; and that the defendant had no quarrel with the deceased, but was perfectly friendly with him. The bill of exceptions purports to set out all the evidence, the material portions of which are here given.

The court, in the charge given *ex mero motu*, read, as a portion of the charge, extracts from the opinions of this court in

VOL. LXXV.

[Holley v. The State.]

the cases of *Mitchell v. The State*, 60 Ala. p. 28, and *Ex parte Brown*, 65 Ala. p. 447. To these extracts, which need not be here set out, exceptions were duly reserved.

The defendant then asked the court in writing to give the following charges : (1) " The jury can not convict the defendant of murder in the first degree, unless they firmly believe from the evidence that he had murder in his heart when he fired the fatal shot." (2) " If the jury believe from the evidence that the defendant, at the time he fired the fatal shot, honestly believed that it was necessary for him to shoot the deceased, in order to protect his person or property, then the jury can not legally convict him of murder in the first degree." (3) " That under the evidence in this case, the deceased had no legal right to take the gun forcibly from the defendant ; that if he had done so, just before the fatal shot was fired, when the evidence shows that he was contending for the gun, it would have been robbery ; and if the defendant believed, when he fired the fatal shot, that the deceased was about so to take the gun from him, then he had a right to shoot, to prevent the robbery ; and he can not be convicted of murder in the first degree." (4) " If the jury believe from the evidence, that the defendant had no previous malice against the deceased, then this is a circumstance which may raise a reasonable doubt in the minds of the jury, taken in connection with the other evidence in this case, as to whether the killing was willful and intentional ; and if the jury have a doubt as to this matter, then they can not convict the defendant of murder in the first degree." (5) " If the jury believe the evidence, they can not legally convict the defendant of murder in the first degree."

A motion was made by the defendant in arrest of judgment, the grounds of which are sufficiently indicated in the opinion.

Name of appellant's counsel not disclosed by the record.

H. C. TOMPKINS, Attorney-General, for the State.

BRICKELL, C. J.—1. The objection taken to the indictment can not be sustained. An indictment receives its legal efficacy from the finding and return of the grand jury ; and the legal evidence of its verity is the return " a true bill," apparent upon some part of it, bearing the signature of the foreman. The signature of the solicitor, with a designation of the circuit in which he is the law-officer of the State, is proper, but it is not essential to its authentication or sufficiency.— *Ward v. State*, 22 Ala. 16 ; *Harrall v. State*, 26 Ala. 52. The present indictment bears the signature of

2

the solicitor *pro tempore* appointed by the court, in the absence of the solicitor of the circuit, for the particular term. As the appointment was temporary, limited to the particular term, his relation to the court is precisely expressed by the designation appended to his signature—*solicitor pro tem.* Any other designation would not have been true.

2. There was no impropriety in the production and exhibition to the jury of the vest of the deceased, worn at the time of the killing, and perforated by the shot.—Burrill on Cir. Ev. 437.

3. Reading to the jury as instructions extracts from reported judicial decisions, or from text books, not accompanied with instructions adapting them to the particular case, it may be, is reprehensible, because of its tendency to confuse and embarrass, rather than to enlighten them. The extracts from the decisions of this court, which were read by the presiding judge in the course of his general charge, embody only settled principles of the law of homicide, which it is the duty of the court in some appropriate form to state to the jury in all cases similar in facts to the present case. These extracts were not submitted as mere abstract rules or principles of law ; for it is apparent they were accompanied with instructions designed to aid the jury in their application. Of these instructions there is no complaint; and there is no room for any other presumption than that they were appropriate and just.

4. The first instruction requested by the defendant was properly refused ; it is so framed and expressed that its immediate tendency was to confuse, if not to mislead the jury. The material inquiry was, whether the homicide was committed willfully, deliberately, maliciously, and with premeditation. It may be said, there could not have been a concurrence of these elements, unless the heart of the defendant was depraved— unless, in the language of the instruction, he had *murder in his heart.* That depends upon the construction which the instruction may receive from the jury ; and if it be the true and only construction of which it is justly susceptible, it is obvious the mere statement of the abstract proposition would have been confusing and embarrassing, unless followed by an explanatory instruction, directing the attention of the jury to the necessary ingredients of murder in the first degree. Instructions requested, having a tendency to confuse or mislead, or which require explanation or qualification, are properly refused.—1 Brick. Dig. 339, §§ 660–61.

5. It is not clear or apparent that the evidence authorized instructions touching the law of justifiable homicide. The error is, perhaps, too common, that such instructions are appropriate whenever the killing occurred on a sudden quarrel, or in

a sudden affray. But to authorize them, there must be evidence tending to show that there was in fact, or the circumstances generated a reasonable belief of, the existence of a present, imperious necessity, not resulting from the wrongful act of the defendant, for him to take the life of the deceased, to avoid the loss of his own life, or to avoid grievous bodily harm. But in this case, that consideration may be waived with the remark, that it is of the highest importance, in all cases, civil or criminal, that instructions to the jury should have their origin in a state of facts of which there is evidence, or which there is evidence tending to prove; otherwise, they are abstract. The first of these instructions affirms that an honest belief of a necessity to take life will justify a homicide. It is not an honest, but a reasonable belief, that justifies. An honest may not be a reasonable belief; it may be the offspring of fear, ala'm or cowardice, or it may be the result of carelessness, and irrational. A reasonable belief, generated by the attendant circumstances—circumstances fairly creating it—honestly entertained, will justify a homicide; but not an irrational belief, however honest it may be.—*Oliver v. State*, 17 Ala. 587; *Harrison v. State*, 24 Ala. 67. The second instruction is equally, if not more objectionable. It is enough to say of it, that if the evidence has any tendency to show an intent on the part of the deceased, or an attempt by violence to take the gun from the defendant, if the intent and attempt had been consummated, robbery could not possibly have been imputed to the deceased. A felonious intent, the intent to steal, is as essential to the commission of robbery, as it is to the commission of larceny. The only intent imputable to the deceased, if the gun had been taken violently from the hands of the defendant, would have been an intent to compel the defendant to pay a debt due to the brother of the deceased; this was not a felonious intention, though it would not excuse or mitigate the trespass committed in the taking.—2 Bish. Cr. Law, §§ 849, 1162a.

6. Murder in the first degree, as it is described and defined by the statute, is of four kinds or classes, which were carefully enumerated and distinguished in *Mitchell v. State*, 60 Ala. 26; and it is not now necessary to repeat the classification and distinction. This homicide, if it be murder in the first degree, falls within that species described in the statute, to distinguish it from all other species, as "any other willful, deliberate, malicious, premeditated killing." The elements or qualities of the offense being declared so particularly, it is essential that each and all should concur and co-exist; the absence of either, if it does not relieve the act of all criminality, at least reduces it to some other degree of criminal homicide. *Malicious*, as

the term is used in the statute, is construed as signifying a killing perpetrated with fixed hate, or done with wicked intentions or motives, not the result of sudden passion.—*Mitchell v. State, supra.* The fixed hate, or the evil intent or purpose may be instantaneous—there may not have been any previous manifestation of it ; hence, we find it constantly laid down in the books, in reference to malice as the element of murder at common law, and as the element of murder in the first degree under statutes dividing felonious homicide into degrees, that it is enough if it exists at the instant of the killing, although it may be at a period of time inappreciably distant.—Whart. Hom. §§ 32–33. The obvious error of the instruction requested by the appellant, which, it is supposed, it was intended should direct the attention or the jury to an inquiry into the presence or absence of malice, is, that it attaches an undue importance to the want of previous malice on the part of the defendant towards the deceased, and hence, was calculated to mislead, unless followed by explanatory instructions. A court may properly refuse an imperfect instruction—an instruction which needs modification, qualification or explanation. The instruction is also wanting in precision and definiteness ; it it difficult to discover from it the precise point which it was intended to raise. It has long been the practice of this court on error not to revise the refusal of instructions which are wanting in certainty. Such instructions are calculated to mislead the primary court and to confuse the jury.

7. A motion in arrest of judgment must be founded on matter apparent on the face of the record. Extraneous matter may be the subject of a motion for a new trial, but is not available on motion to arrest the judgment.—*Blount v. State,* 49 Ala. 383. The omission of the presiding judge to indorse "given" upon the instructions requested by the defendant, and given to the jury, was not an error of which advantage could be taken on a motion in arrest of judgment. It was matter of exception at the time it occurred, but none was taken ; and the failure to take the exception was a waiver of the error.

We have given the record a careful examination and patient consideration, not unwilling to find error which would justify a reversal of the judgment, and a grant of another trial to the defendant. We have not found it ; and our duty is an affirmance of the judgment. As the day for the execution of the defendant has passed, another day will be appointed by the judgment of this court.