## S. F. SAUNDERS v. STATE.

No. A-25.   Opinion Filed November 23, 1910.

1.   JURY—Formation of Lists—Change of Procedure. Where a jury list is made up in conformity with the law in force at the time, and subsequently the law respecting the selection of jury lists is changed, but with a provision that any jury box filled in accordance with the old law should not be affected, the jury list previously made up is valid.

2.   SAME—Statutes—Presumption of Regularity. An act which became effective on December 31, 1907, provided that the jury commissioners should meet on the first Monday in January and the first Monday in July of each year to select a list of jurors, and that the jurors should be selected from the poll books of the county. A subsequent act, which became effective on February 20, 1908, repealed the former act, and provided that the jurors

should be selected from the tax roll, but that any jury box filled under the former act should remain unaffected. On May 11, 1908, defendant filed a challenge to the panel of petit jurors on the ground that they were drawn from a list selected from the poll books and not from the tax roll, but did not allege or show when the list was made up. The lower court overruled the challenge. Held, that the challenge and proof thereunder were insufficient, and that the challenge was properly overruled.

3. APPEAL AND ERROR—Case-Made—Showing Error. A matter assigned as error in the motion for a new trial and in the petition in error, but not shown by the case-made to be true, cannot be considered in the appellate court.

4. JURY—Service of Venire by Deputy Sheriff. A duly appointed, qualified and acting deputy sheriff, having no special personal disqualification, is as competent to serve a venire for jurors as is the sheriff himself; and a defendant has no legal right to require that the sheriff and not his deputies serve the venire.

5. JURY—Service of Venire — Bias of Officer—Challenge. Under Section 6801 of Snyder's Comp. Laws, the fact that a venire for special jurors was served by a biased, prejudiced or incompetent person, should be taken advantage of by a challenge to the special venire.

6. APPEAL AND ERROR—Improper Argument—Preserving Exceptions. The argument of attorneys to the jury is a part of the trial, and improper statements made by an attorney in the argument of a cause in open court and in the presence of the trial judge, to be reviewed in the appellate court, must be shown by proper recital in the case-made or bill of exceptions, and cannot be shown by affidavits.

7. SAME—Case-Made—Scope of Certification. The trial judge's certificate to the case-made attests the truthfulness and correctness of everything recited therein as having in fact taken place, but it does not attest the truthfulness of affidavits filed in support of or in opposition to matters alleged in the motion for a new trial.

8. HOMICIDE—Murder—Evidence — Clothing of Deceased. On a trial for murder, where the plea is self-defense, a coat worn by deceased at the time of the homicide and which shows the point of entrance of the fatal bullet, is admissible in evidence.

9. INSTRUCTIONS—"Reasonable Doubt." For a correct definition of reasonable doubt, see opinion.

10. HOMICIDE—Self-Defense — Threats—Admissibility. On a trial for murder. where the plea is self-defense, and where there is some evidence other than threats tending to support the plea, proof of threats, communicated and uncommunicated, is admissible: the latter as a circumstance to be considered in connection

with all the other evidence in the case in determining the state of deceased's feelings toward the defendant and who was the probable aggressor in the fatal difficulty, and for no other purpose; the former, not only for that purpose, but also as a circumstance in determining what the defendant might reasonably have apprehended from the overt acts and demonstrations of the deceased, if he made any, at the time of the fatal difficulty.

11.    SAME. Proof of bare threats made by the deceased, either communicated or uncommunicated, will not mitigate a homicide; and such proof is not admissible at all unless there is first introduced some evidence other than that of the threats themselves tending to show that the deceased at the time he was killed was making some overt act or demonstration which furnished the defendant reasonable cause to believe that he was in danger of being killed or of receiving great bodily injury at the hands of the deceased.

12.    APPEAL AND ERROR—Misconduct of Jury—New Trial—Discretion. When an allegation in a motion for a new trial, that one of the jurors was intimidated and unduly influenced by his fellow jurors to agree to a verdict of guilty, is supported by affidavits on the one hand and controverted by affidavits on the other, the lower court's determination of the issue cannot be disturbed unless it reasonably appears that the court abused his discretion in the matter, or that his determination of the question was wrong.

13.    CONTINUANCE — Hearing on Motion — Absence of Accused. Where the court sustains a motion for a continuance filed by the defendant, the fact that the defendant was not present at the hearing thereon is non-prejudicial.

14.    TRIAL—Oath of Jury Bailiff—Sufficiency. Where a jury bailiff has been duly sworn, it is not necessary that he be resworn when he is directed to take the jury out of the room during an argument to the court on a question of law, no recess or adjournment being taken. An admonition to the bailiff and the jury suffices.

15.    TRIAL—Conduct of Jury—Articles of Evidence in Jury Room. There is no error in allowing the jury to take with them to their jury room a coat worn by the deceased when he was shot, which was introduced in evidence, where the defendant through his attorney in open court consents thereto. And in such case there is no error in some of the jurors putting on the coat in their jury room for the purpose of observing the location of the bullet holes therein.

(Syllabus by the Court.)

*Appeal from District Court, Stephens County; Frank M. Bailey, Judge.*

S. F. Saunders was convicted of the crime of murder, alleged to have been committed on one William Edward Carnahan on December 9, 1907, and his punishment was assessed at imprisonment at hard labor in the state penitentiary for and during the term of his life.

The evidence on the part of the state tended to show that the deceased, during the year 1907, was a tenant under the defendant on a farm claimed by the latter; that the farm was in litigation, and a few days before the homicide the deceased had entered into a rental contract for the same land for the following year with some parties claiming adversely to the defendant; that this had angered the defendant, and he had declared that the deceased should not stay on the farm. On the morning of the homicide the deceased was in the field cutting corn stalks with a stalk-cutter, a two-wheel implement, drawn by two mules. The deceased's son, a boy about 14 years old, and a hired man were cutting wood some little distance from where the homicide occurred; but the brow of a hill hid the deceased and the defendant from their view at the particular time of the homicide. They heard some shots in the direction where the deceased was, and on going to the place found the deceased lying on his back dead. This was about nine o'clock in the morning. The neighbors were notified, the news spread and large crowds came to view the body during the day. The body remained there until the coroner came, about dark. The evidence shows that the weather was cold, and that the deceased at the time he was shot had on an undershirt, a top shirt, a vest and two coats; that the under coat was buttoned up and the outer coat was fastened with safety pins. The deceased also had on a pair of heavy leather gloves. All these remained on the body untouched until they were removed by the coroner. The deceased was shot twice, each of the shots taking effect in the back. Although troops of people came to the scene of the killing and examined the surroundings, yet no weapon was found on or near the deceased until just about dark. One Henry Pruitt and one Bone Woolsey had come

and gone to and from the body several times during the day, and were there between sun down and dark. While they were standing around close to the body Bone Woolsey pointed toward Henry Pruitt's feet and said, "Why, there is a pistol," and the sheriff, who had arrived, stooped and picked up a bright nickle plated 38 caliber pistol. It was shown that the deceased's pistol, and the only pistol which he was known to possess, was at his home, under the pillow at the head of his bed at the time of the shooting. Blood was found on the blades of the stalk cutter and on the lines with which the deceased drove the mules to the cutter, showing that he was shot while seated on the cutter.

The defendant admitted the killing, but contended that the same was done in his necessary self-defense; that he rode up to the deceased, and had some words with him in regard to the possession of the farm, and that the deceased got off of the stalk cutter, drew a pistol and said, "We will settle it right here"; that thereupon the defendant drew his pistol; that the deceased fired first, and then the defendant fired, the shots being very close together; that the defendant fired three shots and the deceased two. The deceased was struck twice, each of the shots going into the back and neither of them going through the body. The evidence of the sheriff tended to show that the pistol which he picked up near the body had not been fired, and the state contended that it was dropped there late in the afternoon by a friend of the defendant; and that the deceased was unarmed and was shot without warning while he was driving the stalk cutter. The defendant filed a motion for a new trial, which was heard and overruled, and he appeals. Affirmed.

*Cruce, Cruce & Bleakmore* and *Gilbert & Bond,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Chas. L. Moore,* Asst. Atty. Gen., for the State.

RICHARDSON, JUDGE. Plaintiff in error, hereinafter called the defendant, has filed in this court a petition in error praying a

reversal of the judgment against him, and assigning the commission in the lower court of fifty-two different errors prejudicial to him. Of these assignments only fourteen have been noticed in the defendant's brief, and to these we shall confine our attention.

1. The defendant filed a challenge to the panel of petit jurors, praying that the panel be quashed, vacated and set aside, on the ground that the list of jurors from which the panel was drawn were selected from the poll books of Stephens County, and not from the tax roll as required by law. On proof being offered of the facts alleged, the prosecution admitted that the jurors were selected from the poll books and not from the tax roll; and the court after hearing argument, overruled the motion. The case-made does not show when the jury list was made up from which the panel in question was drawn. The first state Legislature passed an act approved December 21, 1907, which carried the emergency clause. and therefore became immediately effective, by section 2 of which it was provided that the jury commissioners should meet for the purpose of selecting jurors on the first Monday in January and the first Monday in July of each year and at such other times as the district judge might order, and that the names of jurors should be selected from the names on the poll books of the last preceding state election in the various voting precincts of the county. Art. 2, chap. 48, Session Laws 1907-08. The same Legislature subsequently passed another act, which provided that the jury commissioners should meet for the purpose of selecting jurors on the first Monday in January and the first Monday in July of each year, and that, "after the tax rolls of any county shall have been made up, the jury list shall be selected from such tax rolls, and such list shall be selected from the various municipal townships in each county as nearly as practicable in proportion to the voting strength of such municipal township." This latter act expressly repealed the former one, but provided that, "Any jury box filled, or any jury heretofore selected and summoned under the provisions of an act to provide for the selection of grand and petit juries, approved December 21, 1907, shall in

no wise be affected by the provisions of this act   *   *   *." This act carried the emergency; it was approved February 20, 1908, and is in force at this time. Art. 3, chap. 48, Session Laws 1907-8; chap. 55, Snyder's Comp. Laws. The panel in question was drawn and summoned for the May, 1908, term of the District Court of Stephens County, and the challenge to the panel was filed and over-ruled on May 11, 1908. The presumption is in favor of the regu-larity of the proceedings and the correctness of the lower court's ruling. If the jury commissioners met on the first Monday in January, 1908, and selected from the poll books the jury list from which the panel in question was drawn, in accordance with the act approved December 21, 1907, and which was in force until Feb-ruary 20, 1908, then under the saving clause contained in said sub-sequent act approved February 20, 1908, said list remained un-affected and valid until exhausted, or at least until the first Mon-day in July, 1908. As the challenge to the panel contained no al-legation as to when the jury list was selected, and as the time of its selection was neither proved nor admitted, we must presume that the jury list was made up by the commissioners on the first Monday in January, 1908, as the law directed. That being true, the list came within the saving clause of the last act; and the court therefore did right in overruling the challenge. Whether under the present act the failure of the jury commissioners to select the jury list from the tax roll would be ground for a challenge to the panel, it is not necessary to decide.

2. The regular panel of jurors being insufficient from which to obtain a trial jury, the court ordered a special venire for sixty additional jurors issued and served. The defendant complains that the deputy sheriffs and not the sheriff served the special venire; and that this was due to the fact that one of the attorneys for the prosecution stated to the trial judge that, "We don't pro-pose for Cates (the sheriff) to summon this special venire; he is not only a witness in the case, but a partisan." This is assigned as reversible error. There are a number of reasons why this assign-ment is unavailing. In the first place the case-made contains no

showing of any kind or character that the deputy sheriffs and not the sheriff summoned the special jurors, or that any such remark was made to the trial judge by counsel for the prosecution. This was alleged in defendant's motion for a new trial as one of the grounds for a new trial; but the truth of the allegation is not shown by the affidavit or oral testimony of a single person; and we are asked to find that this was true because of the naked and unsupported allegation of the fact in defendant's motion for a new trial. This we cannot do. In the next place the sheriff himself testified on the hearing of the motion for a new trial that there was no action on the part of the prosecution to prevent him from summoning the special jurors, but that on account of certain relations existing, presumably between him and the defendant, he voluntarily took the matter up with the county attorney and the trial judge and asked to be excused from summoning the special jurors. Whether he was excused or not the record nowhere shows, but the journal entry recites that "the sheriff presented to the court the return of the special venire heretofore issued, and returned his list of 51 names, the venire being 9 short of the number required on said venire; thereupon the defendant waived all rights and exceptions thereto." In the next place it is not contended that the deputy sheriffs were incompetent to summon the jurors. Unless some special personal disqualification existed, which is not shown, they were competent to do so; and we are unable to find where the defendant has a legal right to have this work done by one competent and legally authorized person in preference to another equally competent and authorized. Certainly it would be a needless and wasteful consumption of time to require the sheriff personally to summon sixty jurors from the body of the county while his deputies and the court sit idle awaiting his return. And lastly it is not shown that the special jurors were summoned by a biased, prejudiced or incompetent person; and if they were, the matter could have been raised only by a challenge to the special venire. Sec. 6801 of Snyder's Comp. Laws. As it was, this matter was never raised until the motion for a new trial was filed.

3. · The defendant alleged in his motion for a new trial that
E. E. Morris, counsel for the state, in his argument to the jury
said: "Gentlemen of the jury, who found this pistol and picked
it up? Bone Woolsey and Henry Pruitt, a man who has been ar-
rested so many times for murder that it would take him a week to
tell how many times he has been arrested. You know you had
him brought here as a witness; why didn't you put him on the
stand?" The motion for a new trial also says that the court did
not instruct the jury to disregard said statement of the attorney,
and that the defendant by his counsel then and there duly excepted.
And this alleged statement to the jury is assigned as error. The
case-made contains no proper showing that the attorney in fact
made that statement, that the court did not admonish the jury to
disregard it, or that the defendant excepted. The case-made
shows none of these matters, unless it must be taken as so because
it is assigned as ground for a new trial in the motion for a new
trial. The only showing of any kind or character in regard to the
matter contained in the case-made are two affidavits filed in oppo-
sition to the motion for a new trial, one being that of E. E. Morris
himself in which he swears: "I remember during my argument
to have made a statement in substance that Henry Pruitt, who
found the gun near Carnahan's dead body, had been arrested so
many times that it would take him a week to tell it had he been
subpœnaed as a witness in this case for the defendant. And I
had not more than finished my sentence until I was interrupted
both by counsel for defendant and his Honor on the bench, and I
immediately asked leave of the court to withdraw the statement
and the court thereupon in the presence of the jury admonished
me to refrain from any statements not supported by the record,
and the court then and there instructed the jury not to consider
the said remarks." And one W. A. Little also made and filed an
affidavit to the same effect. No affidavits were filed in behalf of
the defendant's contention. If these affidavits could be held to
fulfill the requirements of the law in regard to the manner of show-
ing the statements made by an attorney in the course of his argu-

ment to the jury, still they do not show the saving of an exception by the defendant, and they affirmatively show that the court admonished the jury to disregard the attorney's statement. But the statements of attorneys made in the argument of the case in open court in the presence and hearing of the judge cannot be shown to this court by affidavits either on the part of the state or the defendant; the argument of the cause to the jury is a part of the trial, and statements made therein, to be reviewed, must appear by a proper recital of fact in the case-made so that the certificate of the trial judge will be a certificate to the correctness of the recital. The judge must settle the case-made and thereby determine what was said, so that his certificate will attest the truthfulness and correctness of the recital in the case-made. But the trial judge's certificate does not attest the truthfulness of affidavits offered in support of or in opposition to matters alleged in the motion for a new trial. There is no recital in the case-made that this matter ever took place; the trial judge has never certified that it did take place, and there is therefore nothing before us on this question. Newly discovered evidence and prejudicial matters not occurring in the regular trial of the cause in open court may be shown to the trial judge and on appeal to this court by affidavits as exhibits to the motion for a new trial; but there is no more reason or excuse for showing by affidavit what statement an attorney made to the jury in the argument than there is in showing in that manner the evidence introduced or excluded during the trial, or the rulings of the court thereon.

In *State v. Drake*, 11 Or. 396, 4 Pac. 1204, where the defendant complained of improper argument on the part of the prosecutor, alleged the same in his motion for a new trial, and supported the allegation with affidavits, the court said:

"It is not thought that chapter 2, tit. 7, p. 151, of exceptions in our Code has innovated or affected in any substantial particular the practice as it existed at the common law. The purposes and objects of a bill of exceptions under the Code is to subserve the same end, and to introduce matter which the record would not

otherwise disclose, for the information of the court having cognizance of the cause in error. Now it is perfectly clear that the matter alleged in the affidavit of the defendant could in no way constitute any part of the record except through the instrumentality of a bill of exceptions. It is not intended in such cases that a party may make a statement in writing of what he conceives to be his grievances, and, by swearing to it and filing it, and then moving for a new trial, and the court overrules the motion, he has incorporated the matter into the record, so as to make it a part thereof, and to enable this court to review it. If this can be done, the statement of exception provided by the Code to be settled, signed, and allowed by the court before whom the cause was tried, to bring such matter into the record, and lay the foundation for appellate review, becomes a useless and meaningless thing. The whole business may be accomplished without the aid of the court and untrammeled by its authority. It has always been supposed that the record of a court is made up under the solemn sanction of the court, and to make exceptional matters occurring during the progress of the trial a part of such record it must be so ordered by the court. Irrelevant language addressed to the jury is no part of the record of that cause until made so by bill of exceptions under judicial order. But when made so, and properly before us, we have not failed to condemn it when its harmful results were manifest. *Tenny v. Mulvaney*, 8 Or. 520. But without putting such matter in a bill of exceptions, and authenticating it in the manner required by law, the court cannot receive it because there is no legal evidence before the court that it contains a correct record of the proceedings. *Edwards v. Kearney*, 13 Neb. 532, 14 N. W. Rep. 536."

See, also, *Hannum v. State*, 90 Tenn. 647; *Turner v. State*, 4 Lea. 209; *Starr v. United States*, 4 Ind. Ter. 550, 76 S. W. 105.

4. The defendant assigns as error that the county attorney in his address to the jury used the following language: "The jurors of this county must put a stop to the numerous crimes of murder that have been and are being committed." This assignment cannot be considered for the reason that the case-made nowhere shows that the county attorney used the language imputed to him.

5. Next it is contended that the county attorney entered into an agreement with the sheriff and his deputies by which no person

was to be summoned as a juror in this case from the towns of Comanche and Duncan in Stephens County; but the case-made also fails to show in any manner that any such agreement was made or that no jurors were in fact summoned from those two towns, and therefore this assignment cannot be considered.

6. The court admitted in evidence over the defendant's objection the two coats and the pair of heavy gloves worn by the deceased at the time of the homicide; and this is assigned as error. It is contended that there was no dispute as to the character, location and fatality of the wounds inflicted on the deceased; that the clothes served to throw no light upon that issue, and that they were calculated to prejudice the jury against the defendant. We think the coats were competent for the purpose of showing the exact location of the two wounds, and of enabling the jury to form an estimate of the relative situation of the parties when the shots were fired; and the gloves were competent for the purpose of enabling the jury to determine whether or not the deceased. with those gloves on his hands would likely have been able to draw a small pistol from his pocket and fire it. When the clothes were offered in evidence neither the court nor the prosecution could know that there would be no dispute as to the location of the wounds; and if the testimony of the defendant and his witness Abe Paul be true, then the wounds could not within any reasonable probability have been inflicted on that part of the body where the coats showed them to be. The coroner, who was also a physician, testified that one bullet entered about six inches below the angle of the scapula and about four inches to the right of the spine; the other wound was in the buttock. The garments were competent in corroboration of this evidence and for the purpose of showing exactly what was inexactly stated. Nor is the state required in such cases to stand on the oral testimony of one or two witnesses without supporting their testimony by demonstrative evidence; nor can the state be precluded from offering such evidence by a general statement made by the defendant's attorney in objecting to the evidence that "there has been no dispute raised as to the mortality

or location of the wounds." Mr. Wigmore in his work on Evidence says that the objection that the sight of deadly weapons or of cruel injuries tends to overwhelm reason and to associate the accused with the atrocity without sufficient reason, cannot be entirely overcome; "but," says he, "it is to be doubted whether the necessity of thus demonstrating the method and results of the crime should give way to this possibility of undue prejudice. No doubt such an effect may occasionally and in an extreme case be produced; and no doubt the trial court has a discretion to prevent the abuse of the process. But, in the vast majority of instances where such objection is made, it is frivolous, and there is no ground for apprehension. Accordingly, such objections have almost invariably been repudiated by the courts." Here the issue was whether or not the defendant acted in self-defense, and the exact point of entrance of the bullets was a very material circumstance in determining that question. And it would seem that if the average jurors are so unreasoning, their sensibilities so readily affected, their faculties so easily overcome, and their minds so quickly inflamed with prejudice and passion, as to require the withholding from them of evidence to which all reasonable persons concur in giving probative value, then the jury system must be a frail and fragile thing indeed, and a jury's verdict the very essence of inconclusiveness and uncertainty, a veritable "blind man's guess."

In *State v. Wieners,* 66 Mo. 13, the court said:

"So of the exhibition to the jury of the bones of the vertebral column of the deceased. It served to show to the jury the attitudes and relative positions of the parties when the shot was fired. It was not an unnecessary parade of the bones of the dead man to excite prejudice against his slayer, but was legitimate and proper evidence, and a party cannot, upon the ground that it may harrow up feelings of indignation against him in the breasts of the jury have competent evidence excluded from their consideration."

In *People v. Fernandez,* 35 N. Y. 49, 64, which was a prosecution for murder, the court said:

"The exhibition of the articles in the condition in which they were found was more satisfactory in connection with the other

circumstances, than any description of them that could have been given by the witnesses. It is said by Starkie, in relation to evidence of this nature, that 'upon the trial of a prisoner, on a charge of homicide or burglary, all circumstances connected with the state of the body found, or house pillaged, the tracing by stains, marks or impressions, the finding of instruments of violence or property, either on the spot or elsewhere, in short, all visible *vestigia,* as part of the transaction, are admitted in evidence, for the purpose of connecting the prisoner with the act. Such facts and circumstances have not improperly been termed inanimate witnesses.' (1 Stark. Ev. 66.) Our laws are not specially framed to shield guilt from detection; they exclude nothing legitimately connected with the *res gestae* of crime. In cases of this nature, such proof is uniformly received, and is equally admissible, whether it tends to inculpate or exonerate the party accused. (1 Greenl. Ev. p. 108; *Campbell v. State,* 21 Ala. 40, 44; *People v. Larned,* 7 N. Y. 445, 452.)"

In *King v. State,* 13 Tex. App. 277, where the defendant was charged with murder and pleaded self-defense, the court said:

"Upon the trial of this case, the State, over defendant's objections, was permitted to introduce and exhibit to the jury a coat and pair of pants which were proved to have been on the person of deceased at the time he was shot. Testimony of this character is often times pertinent, material and admissible. (*Hubby v. The State,* 8 Texas Ct. App. 806; *Early v. The State,* 9 Texas Ct. App. 485.) In this instance it is not made to appear by the defendant's bill of exceptions, or otherwise, that the exhibition of this clothing to the jury was improper and inadmissible. It is disclosed by the evidence that the position of the person who fired the fatal shot, at the time it was fired, was a material inquiry on the trial, and was left in doubt. This being the case, the clothing in question, which probably had been perforated by the leaden messengers which produced the death of deceased, might furnish most convincing proof of the exact position of the slayer when he fired the shot. Viewing the matter as presented by the record, we are not prepared to say that the court erred in admitting the clothing before the jury."

See, also, *Rex v. Reason,* 16 How. St. Tr. 42; *Holley v. State,* 75 Ala. 14; *Watkins v. State,* 89 Ala. 82; *Dorsey v. State,* 107 Ala. 157, 18 So. 199; *People v. Howes,* 98 Cal. 648, 33 Pac. 791;

*Painter v. People,* 147 Ill. 444, 35 N. E. 64; *Henry v. People,* 198 Ill. 162, 65 N. E. 120; *Story v. State,* 99 Ind. 413; *Davidson v. State,* 135 Ind. 254, 34 N. E. 972; *Thrawley v. State,* 153 Ind. 375, 55 N. E. 95; *State v. Jones,* 89 Iowa, 182, 56 N. W. 427; *State v. Stair,* 87 Mo. 268; *Gardiner v. People,* 6 Park Cr. C. (N. Y.) 155, 201; *State v. Symmes,* 40 S. C. 383, 19 S. E. 16; *Turner v. State,* 89 Tenn. 547, 15 S. W. 838; *Hubby v. State,* 8 Tex. App. 597; *Early v. State,* 9 Tex. App. 476, 485; *Hart v. State,* 15 Tex. App. 202; *Barkman v. State,* 41 Tex. Cr. 105, 52 S. W. 73; *Bennefield v. United States,* 2 Okla. Cr. 44, 100 Pac. 34.

In the instant face the articles of clothing introduced were thoroughly identified by the coroner; there was nothing dramatic or spectacular in the identification or introduction of them; they were evidence of a relevant and material fact, and were admissible.

7. It is also urged that the court erred in admitting in evidence the pistol with which the defendant killed the deceased. There was no error in this.

8. The court in his instructions defined a reasonable doubt as follows:

"'You are instructed that you cannot convict the defendant of any crime or degree of crime, unless his guilt is proven to your satisfaction beyond a reasonable doubt. By the term reasonable doubt, I do not mean a possible doubt, a mere speculation, or a captious quibble, suggested for the purpose of evading the performance of an honest duty, but by a reasonable doubt is meant that state of mind, which, after a fair comparison and consideration of all the evidence in the case, both for the state and for the defense, leaves the mind of the jury in that condition they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge. If you have such doubt, if your conviction of the defendant's guilt of the crime as alleged in the indictment does not amount to a moral certainty from the evidence in the case, then you should find the defendant not guilty."

This definition is complained of, and the defendant says that it was condemned in *Abbott v. Territory,* 1 Okla. Cr. 1, 94 Pac. 179, and in *Price v. State,* 1 Okla. Cr. 358, 98 Pac. 447. The vice in the instructions given in those cases, however, as stated by the

court was the fact that the jury were told that a reasonable doubt was a doubt for which they could give a reason, or for which a reason could be given. We find no such statement in this instruction. No particular error in the instruction has been pointed out, and we perceive none.

9. The court in an instruction on threats told the jury that evidence of threats might be considered by them in connection with all the other evidence in the case in determining who was the probable aggressor and in determining what apprehension might reasonably arise in the mind of the defendant from the conduct of the deceased. The defendant complains of this instruction as being too narrow and limited in its scope; and in support thereof he cites the case of *Price v. United States,* 1 Okla. Cr. 291, 97 Pac. 1056, in which Judge Baker said:

"Threats made by the deceased against the accused are admissible, upon the trial of the accused for the killing of the deceased: To show that the deceased manifested an angry and revengeful spirit toward the prisoner, and a determination to do violence to his person; to shed light upon the mental attitude of the prisoner towards the deceased when the homicide occurred; to show a mitigation of the offense charged; to show the condition of the mind of the deceased, and the condition of mind of the defendant at the time of the homicide; to show the purpose and motives of the deceased in making the attack; to show whether or not the killing was done in self-defense; to show reasonableness of the fears of the defendant at the time of the homicide that he was in danger of losing his life, or of receiving great bodily harm, at the hands of the deceased; to show who was the aggressor; and, as part of the *res gestae,* where they tend to excuse or palliate the conduct of the accused; and to establish the state of feeling entertained by the deceased towards the accused. Uncommunicated threats are evidence of the mental attitude toward the prisoner. Communicated threats shed light upon the mental attitude of the prisoner toward the deceased when the homicide occurred. Both are clearly admissible."

Every true statement in the foregoing is reducible to two rules often announced and uniformly adhered to, namely: (1) That proof of an uncommunicated threat is admissible, where the

plea is self-defense, as a circumstance to be considered in connection with all the other evidence in the case in determining who was the probable aggressor in the fatal difficulty, and for no other purpose; (2) and proof of a communicated threat is admissible not only for that purpose, but also as a circumstance in determining what the defendant might reasonably have apprehended from the overt acts and demonstrations of the deceased, if he made any, at the time of the fatal difficulty. Every statement made by Judge Baker above, except that threats are admissible to mitigate the offense, and to show the purpose and motives of the deceased in making the attack, is only another manner of stating one or the other of the two rules so often announced. And the statements that threats are admissible to mitigate the offense and to show the purpose and motives of the deceased in making the attack, are not true except in a very qualified sense. Proof of bare threats made by the deceased will not mitigate a homicide in the least; nor does a bare threat to kill or injure throw any more light upon the motive than does the assault itself. Threats made by the deceased are not admissible at all unless there is first introduced some evidence other than the threats themselves tending to show that the deceased at the time he was killed was making some overt act or demonstration which furnished the defendant reasonable cause to believe that he was in danger of being killed or of receiving great bodily injury at the hands of the deceased. If one kill another merely because the other has threatened him, it is murder. Where the plea is self-defense, and where there is evidence other than mere threats tending to show that the deceased was the aggressor and that the defendant acted in his real or apparent necessary self-defense, then evidence that prior to the fatal difficulty the deceased had made threats of violence against the defendant is admissible, and may be considered in connection with all the other evidence in the case in determining the state of the deceased's feelings toward the defendant and who was the probable aggressor in the fatal difficulty. Also, if under such circumstances it is shown that prior to the fatal difficulty the defendant had been informed that

the deceased had made threats of violence against him, and in good faith believed the information, whether such information was in fact true or not, then the defendant is entitled to have the fact that he received that information considered, together with all the other facts and circumstances in evidence in the case, for the purpose of determining the state of the defendant's mind and what he might reasonably have apprehended from the overt acts and demonstrations of the deceased, if he made any, on the occasion in question. But mere threats alone, though actually made and communicated, and however violent they may be, will not justify, excuse or mitigate a homicide. The law does not permit one to kill another merely because the other has made threats against him. And unless the deceased at the time of the fatal difficulty, without being willfully provoked thereto by the defendant, and without the defendant having sought the difficulty or having voluntarily entered into it, made some overt act or demonstration indicating to the defendant as a reasonable man an intention to kill him or do him some great bodily injury, then any threats previously made against or communicated to the defendant are immaterial for any purpose in the case; and the jury should be so instructed. We therefore find no error in the instruction given. *Morris v. Territory,* 1 Okla. Cr. 617, 99 Pac. 760; *Reed v. State,* 2 Okla. Cr. 589, 103 Pac. 1042; Wigmore on Evidence, vol I, sections 110 and 111.

10. On May 18, 1908, the defendant filed a motion for a new trial to which were attached certain affidavits in support of two assignments in the motion. On May 21, 1908, the county attorney filed certain controverting affidavits, and asked leave to file an answer to those assignments and to file additional affidavits. The court granted this leave, and in the presence of the defendant and his counsel made an order continuing the hearing on said motion for a new trial until May 23rd. On the last named day the state filed its answer to defendant's motion, and also filed additional affidavits in support of the answer. The court on that day heard the motion for a new trial and overruled the same. The defendant contends that the court should not have permitted the state to

file its answer and the additional controverting affidavits on the day on which the motion for a new trial was heard. We do not know and the case-made does not disclose whether the state could have filed them earlier or not. The answer and controverting affidavits went squarely to the issues tendered by the motion; the court was present, had the parties before him, and we presume was familiar with the circumstances. The matter rested in the sound discretion of the court, and we cannot say from an examination of the record that the court abused this discretion. It appears also that the 23rd day of May was the last day of the term and the court ordinarily could not have been required to continue the hearing on the motion for a new trial beyond the term. It is stated in the brief that the state's answer to the motion and the additional controverting affidavits were filed just one hour and forty-five minutes before sentence was passed upon the defendant. The case-made nowhere shows that this was true, and we cannot assume that it is true merely because it is so stated in the brief; and if it were true, still we could only say that that matter also rested within the sound discretion of the court, and that the issues tendered in the motion for a new trial and to which the affidavits related, considering the state of the record, are not such as to show that the court abused its discretion in the premises.

11. It was alleged in the motion for a new trial that one of the jurors was intimidated and unduly influenced by his fellow jurors to agree to a verdict of guilty in this case, and certain affidavits were filed in connection with the motion for a new trial for the purpose of showing this fact. These were controverted by affidavits on the part of the state, and made an issue which the lower court heard and determined; and the court's finding upon this issue and determination thereof could not be disturbed unless it should reasonably appear that the court had abused his discretion in the matter, or that his determination of the question was wrong. It does not so appear. On the contrary, from an examination of the various affidavits filed pro and con, we have no hesitancy in holding that the lower court determined the issue correctly.

Whether or not a juror or jurors may impeach their verdict by affidavits in regard to the manner in which they reached it, is a question which we do not find it necessary to determine in this case.

12. It is also alleged by the defendant that the record did not show the defendant's presence on March 3, 1908, a day of a previous term, when the court passed on a motion for a continuance filed by the defendant; and it is stated that this was such an error as to require a reversal of the cause. We find upon an examination of the record, however, that the court granted the continuance, and the defendant having had the relief which he desired, we do not see wherein he was prejudiced by not being present, if in fact he was not present. His presence there could have been beneficial to him only for the purpose of giving his testimony upon the motion, of counseling and assisting his attorneys in presenting the same, and of making whatever efforts he could to further the procuring of the relief which he desired. The relief having been had, every end was obtained which his presence could have served. The law does not require the presence of the accused on the hearing of a motion of this character merely to afford him the pleasure of observing the court render a decision; and his motion having been sustained, the fact that he was not present when the same was passed upon is immaterial. Whether this would be so had the motion been denied, it is not necessary to determine. But if we should hold this proceeding to have been erroneous and should reverse the cause on that account, how could the error be cured? The continuance was granted, and that term of court has long been a thing of the past. The act is irretrievable. If the cause should be reversed and remanded, would not this assignment be as available on another appeal, and on still another, as on this one? A moment's reflection makes the absurdity of the proposition apparent. It is as though asking the reversal of a judgment rendered at a second trial because of some error committed during the first one. It is proper to state, however, that the court caused the journal entry to be corrected by *nunc pro tunc* orders showing that the defendant was personally present and was

represented by attorneys at the time the motion in question was passed upon, and at every other stage of the proceeding.

13.  It is also urged as error that during the argument of a question of law to the court, the court allowed the jury to retire from the court room in charge of the bailiff without having the bailiff re-sworn.  It was not necessary to have the bailiff re-sworn. Whenever the court takes a recess the officers must be sworn to keep the jury together until the next meeting of the court and to suffer no person to speak to, or otherwise communicate with them, nor to do so themselves on any subject connected with the trial of the cause, and return them into court at the next meeting thereof. But where the bailiff has already been sworn, it is not necessary that this oath be readministered every time the court sends the jury out of the court room while the attorneys are discussing a question of law, and when the court has not taken a recess.  The oath already taken is binding and is sufficient, and an admonition to the bailiff and the jury suffices.  Moreover the journal of the court shows that the jury was duly admonished and the bailiff duly sworn as required by law at each and every recess and adjournment of the court during the trial of the cause.

14.  Lastly it is assigned that the court erred in permitting the clothing of the deceased to be taken to the jury room.  There is no recital or statement in the case-made to the effect that the jury took the clothing of the deceased to the jury room.  The first mention we find of this in the case-made is the statement of the fact in the motion for a new trial.  The state filed the affidavit of certain jurors to the effect that, at the conclusion of the argument of counsel and before the jury retired to deliberate upon their verdict, the jury in open court requested permission to take the clothing of the deceased with them to the jury room; that Mr. Gilbert, attorney for the defendant, stated that he had no objection to the clothing being taken, but that he did not want the pistols taken to the jury room; and that accordingly only the clothing was taken.  Having consented that the clothing might be taken to the jury room, the defendant cannot now be heard to say

that it was error for the court to permit it. It is also urged that the jurors were guilty of misconduct in that some of them put on one of the coats in the jury room for the purpose of ascertaining the exact location of the bullets' entrance into the body. We can conceive of no other purpose for which the jurors could want the coats. Certainly they did not request permission to take the coats to their jury room merely to throw them down in a corner. If these coats had been taken to the jury room without the defendant's permission, it might have been error; but the defendant having consented thereto, the error, if any, was waived. *Consensus tollit errorem.* Misconduct on the part of the bailiff is alleged; the court heard the evidence pro and con upon this matter, and correctly found, as we think, that there was no misconduct on the part of the bailiff.

We find no reversible error in the proceeding. In our opinion the evidence in this case shows beyond any character of doubt that this defendant committed a cold-blooded assassination by maliciously and premeditatedly shooting an unarmed man in the back. The judgment of the lower court will be affirmed.

FURMAN, PRESIDING JUDGE, and DOYLE, JUDGE, concur.