## ED GING v. STATE.

No. A-4999.   Opinion Filed Oct. 3, 1925.
(239 Pac. 685.)

A. J. Stevens, C. E. Wilhite, and A. R. Carpenter, for plaintiff in error.

The Attorney General and Fred Hansen, Asst. Atty. Gen., for the State.

BESSEY, P. J.   The plaintiff in error, Ed Ging, here referred to as the defendant, at the time of the

homicide, was about 50 years of age. About 15 or 16 years before he had married Cora Ging, who was then a girl of the age of 15 years. Two children were born to this union, a boy and a girl, at the time of this tragedy of the respective ages of 9 and 14 years. The domestic life of the defendant and his girl wife was unhappy and turbulent from the beginning.

Almost a year prior to the date of the homicide the defendant had employed a farm hand named Red Lahm, who for a short time resided in defendant's home, but who was shortly discharged on account of alleged improper relations with defendant's wife. Almost immediately thereafter the defendant's wife left home and went to the town of Carmen, presumably to complete some business transactions there pending. A neighbor boy, with whom she had driven to Carmen, came back and reported to the defendant that she did not intend to return. Some time later the defendant procured a divorce on the ground of abandonment, and in the decree he was awarded the care and custody of the two children and all of the joint property of himself and wife. Following the granting of the divorce, Mrs. Ging married this former farm hand, Red Lahm.

On the 4th of July, preceding the homicide in August, the former wife of the defendant came into the neighborhood where he lived and made inquiry as to his whereabouts, but failed to meet him on that occasion. To some of the neighbors she stated that she intended to have a property settlement and some arrangement about the children, and in this connection used language that might be construed as a conditional threat against the life and safety of the defendant. These conversations, or portions of them, were communicated to the defendant. The defendant also claims that just before their separation his wife assaulted him with a gun and a butcher knife.

On August 18, 1923, the defendant's wife again came into the neighborhood and sent word to the defendant that she wanted to see him, requesting that he come to where she was at the home of a neighbor. He at first refused to go, but later, in company with another neighbor, started to ride on horseback by the place where she was, as he claims with the intention of talking to her in the event she called to him to stop. The defendant told his companion that, if she did not call or beckon to him, they would ride on past the place. While the defendant and his companion were riding towards this neighbor's house they saw defendant's former wife and her brother approaching in a Ford touring car. As to what took place then we quote excerpts from the testimony of eyewitnesses—Mr. Mizar, brother of the deceased, Mr. Viers, the defendant's companion, and the defendant himself.

From Mr. Mizar's testimony:

"Q. What did you do when you met them? A. She says, 'Stop.' We did.

"Q. Your sister said to stop? A. She did.

"Q. Did Charley Viers and Ed Ging stop? A. Yes, sir; they did.

"Q. Then what was said or done? A. They spoke. We spoke, and they spoke. Ed got off his horse and walked around to the side of the car, on the west side of the car.

"Q. That was the side of the car where your sister, the deceased, Cora Ging Lahm, was sitting, was it? A. Yes, sir; it was, on the right-hand side.

"Q. You said he walked around to the west side of the car beside your sister? A. Yes; he did.

"Q. Then what took place, when he did that? A. Well, he said, 'I understand you want to see me.' She

said, 'Why shouldn't I want to see you, because I want to see the children.' He says, 'I understand you want a settlement.' I don't remember what words she said, if she said anything just then. Then they started to quarreling and wrangling over their past life.

"Q. Do you recall just what the conversation was; in substance, at least? A. He wanted to know where her husband was, or where Red was, and she told him where he was. He says, 'That's the s— o— b— I want to see.' She says, 'You don't want to go up there looking for trouble; if you do, you will sure get it.' Then he jumped back and he said, 'You have caused me the last trouble you are going to.' He jumped back, and got his revolver, and started to shooting.

"Q. How many times did he shoot? A. He shot three or four times, as near as I can remember.

"Q. About how close was Ging to the car at that time? A. He was about five or six feet, as near as I can judge.

"Q. Was he straight from the car? A. He was kind of angling. * * *

"Q. What did Ed Ging say to you when you asked him what you should do with her (after the shooting)? A. He said, 'Take her on; I am through with her.'

"Q. Did the deceased have any gun or weapon of any kind? A. No, sir; she did not.

"Q. Did you have any? A. No; I didn't have any.

"Q. Did she make an effort to attack him or assault him in any way? A. No, sir; she did not. * * *

"Q. What position did she take when he started to shoot, or before he shot; what position did she take in that seat? A. She faced him.

"Q. Turned around this way (indicating)? A. Yes; she did.

"Q. For what purpose did she do that? A. I don't know that. * * *

"Q. Where were her hands when he fired the second shot? A. Up like this (indicating by throwing up hands.)

"Q. She brought them up after he fired the first shot? A. She did.

"Q. Where were they when he fired the third shot? Were they up when he fired the third shot? A. Her hands were still up; yes.

"Q. How many bullets took effect in her body? A. There was two of them."

From the testimony of Charley Viers:

"A. Defendant asked me if I wanted to ride with him, and I told him I didn't care, and he said he was going to go up by the Sanders home, and if they wanted to see him they would come out and stop him in the road, and if they didn't want to see him he wasn't going to stop there. On the way up there we met Mr. Lee Mizar and Mrs. Cora Lahm. Ed had told me, just before we got to them, 'If they don't stop, we will not stop.' We got very near by the car, and they stopped the car, and then we stopped and turned around. Ed spoke, and I spoke, and Mrs. Lahm says, 'Hello, Ed.' Ed was sitting on his horse, and he says, 'I understand you want to see me.' She said, 'I do.' He got off his horse, and walked to the opposite side of the car from where we were, to the right-hand side of the car, and asked her what she wanted to see him about, and she said she came down for a settlement. Ed asked her 'What kind of a settlement?' 'Well,' she says, 'on the children and over this personal property.' She asked Ed if he didn't think she was entitled to half of this personal property, and Ed told her he didn't; that the court had set aside this personal property and the children to him, and had given him the right to them, and he didn't think that he should make any settlement. * * * Ed told her that, if she had stayed and acted right, she could have gone away and had half of this stuff, or could have lived there happily. He said, 'But you know how you went away and I don't think you're entitled to your share of that.' She said, 'I wouldn't have left if you hadn't slapped me one day when I came from town.' Ed said he never slapped her, and she said he did, and she told Ed she didn't come down for a

racket, but for a settlement, and that she expected one. Ed said, 'I have made all the settlement I am going to make.' He asked her where this Red Lahm was, and she says, 'You don't need to look for Red Lahm, or go to Red Lahm looking for trouble; if you do, you will get all the trouble you want.'

"Q. Then what took place, if anything? A. Ed pulled out his gun and shot.

"Q. How many times did he shoot? A. He shot three times, if I am not mistaken; three or four times.

"Q. Did you make any protest against his shooting? A. Yes, sir; I halloaed; but I was sitting on my horse, and my horse was headed towards the north, with my feet on the side of the car, and I halloaed, and that was all I could do.

"Q. Did you see either Lee Mizar or the deceased have any gun or weapon of any kind? A. No, sir; I did not.

"Q. Did you see either Lee Mizar or the deceased make any assault of any kind upon the defendant? A. No, sir; I did not. * * *

"Q. Now, from where you were sitting, did you see what the deceased did, just before the first shot was fired —what move she made, if any? A. I couldn't say as to that.

"Q. You couldn't say? A. No, sir; I could not."

From the testimony of the defendant, Ed Ging:

"A. Well, I seen a Ford car coming, and when they got close enough I said, 'That's them coming now; if they don't stop, let's not stop; but, if they do stop, we will stop and see what they want.' We rode up until we got in front of the car, and we turned to the east side, and I was on the east side of Charley Viers. That throwed Charley next to the car, and me on the east side of him, and we started on by, and when we got past the car they came to a stop. Charley said, 'They want you.' We turned around to the west, like, and that throwed me next to the car, and I rode up by the side of the car, and they both spoke to me, and they said, 'Hello, Ed.' I

said, 'Hello.' She said, 'How are you getting along?' I said, 'All right, so far as I know.' I got off my horse, and started around the front of the car, and got around on the side where she was at. As I was going around the car, she spoke up and wanted to know where the children were, and I didn't give her no answer where they were. I walked on along by the car, and I said, 'Where's Red?' She says, 'It don't make any difference about where Red is at; he will tend to you.' She didn't tell me where he was. I said, 'I undertsand you want to see me.' She says, 'I most certainly do.' I said, 'Well, what is it you want to see me about?' She says, 'I come for a settlement.' I said, 'We haven't got no settlement to make that I know of; I left everything up to the court and the court settled everything there was to be settled.' Then she said, 'I have been here three different times looking for you, and couldn't find you.' I said, 'Well, I heard you were here the night before the 4th; I heard of different times that you have been here; the night before the 4th I heard you was here at Mr. Hold's place; I heard you was there, and told him the day before you left the reason you left was that I beat up on you, and that you had a scar on your head, on the side of your head.' She said, 'You did.' I said, 'No, Cora; you know you lied.' She said, 'You slapped me.' I said, 'I did not.' She spoke up, and she says, 'Well, it don't make a damned bit of difference what the law said or did; settlement is what I want, and I am going to have it.' She started and reached around this way (indicating), and I, of course, got excited, and I thought of what she had said before at times, and lost my head, and I pulled by gun and went to shooting.

"Q. How close were you to her? A. Well, when she started to turn around, I was standing with one foot on the fender, and when she started to turn around this way (indicating) I stepped back a couple of steps and pulled my gun out of my pocket.

"Q. Which way did she turn? A. She turned around this way (indicating), and started to reach behind.

"Q. Started to do what? A. To reach behind.

"Q. What did you think she was going to do when

she did that, Mr. Ging? A. From the threats she had made before, I supposed she was going after a gun.

"Q. What did you say to her? A. I said, 'If that's the way you are going to settle it, we will settle it now.'

"Q. When you said that, what happened? A. I pulled my gun and went to shooting.

"Q. Did you shoot more than once? A. I did.

"Q. Do you know how many times you shot at that time? A. I do.

"Q. How many times did you shoot? A. I shot three times."

Cross-examination:

"Q. You say she turned around in the car? A. Yes, sir; she did.

"Q. Which way did she turn? A. She turned to the right.

"Q. And you say she made a motion with her hand, or something? A. She didn't make no motion. She reached around this way behind (indicating by putting hand behind back).

"Q. You don't know whether she was just putting her hand around there to turn around this way or not (indicating), do you? A. She turned around like this (indicating), and went to reaching with her hand.

"Q. You pulled out your gun? A. I pulled it out; yes.

"Q. And shot? A. Yes."

On cross-examination the defendant was asked the question, "Why did you shoot her?" The defendant objected, and the objection was sustained. The next question, "Did you intend to hurt her?" was suppressed in the same manner.

In the course of the examination of the defendant, offers were made to show that in the year 1917 the de-

ceased threatened to shoot the defendant with a revolver, and that the defendant disarmed her; that in 1918 she told her daughter Ruby, "If he (the defendant) ever comes after me again, when I leave I will shoot his damned head off; I'm just as quick with a gun as he is;" that in 1922 the deceased again made indefinite, undescribed threats against the defendant in the hearing of the daughter; that about two years before the homicide the deceased, in the presence of the daughter, said she would kill the defendant before the sun went down that day; that in July, preceding the homicide in August, she told Dick Howard that, if the defendant disposed of a certain horse, there would be trouble; that in 1922 the deceased told Will Ging and his wife that, if Ed tried to force her to return to him, she would blow his brains out; that she told Dr. and Mrs. Lewis, in July preceding the homicide, that she was looking for Ed, and it was a good thing she didn't see him, or there might have been a shooting; and that some of these threats, or veiled threats, were communicated to the defendant, just which ones and in what manner does not appear.

The court refused these proffers of testimony, on the ground that they were indefinite and remote in point of time, with the exception of those that took place in July, and because there had been no showing that the deceased at the time of the homicide committed any overt act which would reasonably cause the defendant to believe that she contemplated violence against him, and because the proffers were indefinite and otherwise insufficient. This ruling of the court was inconsistent with his instructions to the jury submitting the issue of self-defense. We think that evidence of the more recent incidents should have been admitted, but that the exclusion of this proffered evidence, under the circumstances shown, should not operate as a reversal of the cause. In this connection we must consider that the evidence of the

alleged overt act just prior to the shooting was demonstrative, and that the court may have been justified in holding that the demonstration did not reasonably show any design to kill or to use a deadly weapon.

In the same connection we are bound to consider the fact that the defendant's first shot went wild, and that the fatal shots were fired while the deceased was holding her hands aloft, and while she and the two witnesses begged the defendant not to shoot. In this position she was powerless to do the defendant any harm, and, being so situated, former threats would constitute no excuse or justification for the firing of the subsequent shots. Mere threats alone are not sufficient to justify a homicide; to justify the claim of self-defense, there must be something further done on the part of the deceased, usually some overt act, such as would reasonably cause apprehension of immediate danger. Marshall v. State, 11 Okla. Cr. 52, 142 P. 1046; Saunders v. State, 4 Okla. Cr. 264, 111 P. 965, Ann. Cas. 1912B, 766. As heretofore stated, defendant's counsel would not permit him to answer the following questions:

"Why did you shoot her?"

"Did you intend to hurt her?"

Defendant claims that the submission of the issue of manslaughter was error. There was some evidence showing a quarrel just before the fatal shooting. From this and other circumstances the jury might have concluded that the fatal act was committed in the heat of passion, or done unnecessarily, after the alleged attempt on the part of the deceased had failed. Where the evidence shows any element of manslaughter, however slight, an instruction defining that degree of homicide is proper. James v. State, 14 Okla. Cr. 204, 169 P. 1127.

In instruction No. 8 the court told the jury that, be-

fore the defendant could claim that he was acting in self-defense, it must appear that he really and in good faith endeavored to decline any further struggle or combat before the homicide was committed. This declaration was inaptly worded, but under the evidence it could not have been misleading. After the first shot was fired, the deceased demonstrated that, so far as she was concerned, the combat, if any there was, had come to an end, and she was then powerless to inflict any personal injury upon the defendant. At the point where the apparent danger ceases, the right of self-defense ceases. The right of self-defense must be founded in good faith; there must be a necessity, real or apparent, to justify one in invoking the right of self-defense. 30 Corpus Juris, 44.

In the opinion of this court, the errors appearing in the record are of minor importance, insufficient to warrant a reversal of the judgment of the trial court.

The judgment of the trial court is therefore affirmed.

DOYLE and EDWARDS, JJ., concur.