## HUGH POPE v. STATE.

No. A-2732.    Opinion Filed November 6, 1918.

(175 Pac. 727.)

1.    JURY—Challenge for Cause—Formed Opinion—Question of Law. The issue raised upon a challenge for cause to a juror in a criminal case, on the ground that he has formed an opinion founded upon rumor, statements in public journals, or common notoriety, and upon which he has expressed an opinion, is one of mixed law and fact; and the finding of the trial court upon the issue ought not to be set aside by a reviewing court, unless it appears that upon the evidence the trial court ought to have found that the juror had formed such an opinion that he could not in law be deemed impartial.

Statement of the Case.

2. **SAME—Expression of Opinion—Statute.** The mere expression of an opinion by a juror in common conversation, without anything to show ill will, hostility, or a fixed determination of belief, is not a legal ground of challenge for cause. In order to disqualify the juror there must be "the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging." Section 5858, Rev. Laws 1910.

3. **EVIDENCE—Self-Serving Declarations—Res Gestae.** In a prosecution for murder, self-serving declarations of the defendant, made about three minutes after the homicide and in reference to it, held properly excluded as self-serving and as no part of the res gestae.

4. **WITNESSES—Cross-Examination—Character Witness—Reports.** A witness to good character may be asked on cross-examination whether he has heard rumors of particular and specific charges of the commission of acts inconsistent with the character which he was called to prove. This is admissible, not for the purpose of establishing the truth of such reports, but to test the credibility of the witness and to determine the weight of his evidence. However, such reports, to be admissible, must be confined to a time previous to the commission of the crime charged.

5. **APPEAL AND ERROR—Argument of Prosecuting Attorneys—Review—Affidavits.** Improper remarks made by the prosecuting attorney in his argument to the jury must be incorporated in the case-made by transcript or bill of exceptions allowed and signed by the trial judge before they can be considered on appeal. Such remarks cannot be presented by affidavit unless it appears from the record that the trial judge refused to have such remarks taken down by the stenographer.

6. **HOMICIDE—Manslaughter in First Degree—Sufficiency of Evidence.** In a prosecution for murder, evidence held to sustain a conviction of manslaughter in the first degree.

*Appeal from District Court, Grady County;*
*Will Linn, Judge.*

Hugh Pope was convicted of manslaughter in the first degree, and he appeals. Affirmed.

The plaintiff in error, Hugh Pope, hereinafter referred to as the defendant, was informed against for the murder

of Marvin Chitwood, and, upon trial, was convicted of manslaughter in the first degree.

The evidence shows that the defendant and the deceased, Marvin Chitwood, were, before the night of the fatal difficulty, good friends. The age of the deceased was 18 years, and the age of the defendant was 23 years. The father of the deceased conducted a barber shop in Minco, on the south side of the Main street, in a building of 24 feet front with a partition dividing it into two rooms. One side of the partition was a tailor shop where the deceased worked. The deceased, his twin brother, Mearle, the defendant, and three or four other young men were in the tailor shop on the night of the homicide from about half past 8 until midnight, drinking and making music and dancing. When they left the shop the deceased and the defendant became engaged in a quarrel over locking the door. The brother of the deceased and George Cook preceded the others to the First National Bank corner, and the deceased, followed by the defendant, went to this corner, where the brother of the deceased and the defendant had a fight, and the defendant cut the brother of the deceased on the leg with his knife. The defendant went to the home of the deceased, and called his father and told him that he had cut one of his boys and made threats against the other. The father went to the barber shop, where his son and Jim Dunaway were dressing the cut on Mearle Chitwood's leg. The defendant appeared with a revolver in his hand, and after a few words, and while scuffling with old man Chitwood, shot the deceased. Death was almost instantaneous. A substantial statement of the evidence is as follows:

Jim Dunaway testified:

"I was in the barber shop when it closed that night about 8 o'clock, and I and Mearle Chitwood went to the tailor shop about 10 o'clock. Marvin Chitwood, the deceased, the defendant, George Cook, a stranger, and the Rice boys, who conducted the place, were there. About half past 11 they all left the tailor shop except the Rice boys. When they reached the sidewalk the deceased said to the defendant, 'Now the door is locked, I have locked it, and I would like to see you unlock it.' The defendant hit the deceased, who said, 'Hugh, I don't want any trouble,' and struck at him. I thought they were just scuffling. Then the deceased got up and went up the street and the defendant followed him. I took hold of the defendant's arm, and told him to go home, that they didn't want any trouble. The deceased passed his brother on the corner of the First National Bank building, who asked him what was the matter, and the deceased said that he and Hugh Pope had had a fight and Hugh had whipped him. The defendant was standing there at the time, and his brother Mearle said, 'Can't you whip him?' He said, 'No,' and Mearle said, 'Then I can;' and the defendant walked on up there, and I was persuading him not to go. I had hold of his arm, and he shoved me away, and Mearle Chitwood hit the defendant and knocked him out into the street and jumped astride of him, and then got off. George Cook and the other three boys were present on the corner. I got the two Chitwood boys while George Cook went off with the defendant. I went back with the Chitwood boys to the barber shop to dress Mearle Chitwood's wounds where he had been cut with the knife. The defendant appeared at the door and said, 'Boys, stand still!' and he walked down between the barber chairs to where Mr. Chitwood, the father, was. Mr. Chitwood told him, 'We have always been friends,' and to go on, and it would be all right; that he did not want to have any trouble. Mearle Chitwood was sitting there with the salve in his hands that we had been using on his wounds and he got up to put it away. The defendant told him to stop, and Mearle said he would never stop for any ham. The defendant then displayed a pistol.

When he did this old man Chitwood grabbed him and a
gun fired. The deceased said he was shot. I rushed him
back into the junk room, where he fell, and said, 'I believe
I am shot in the heart.' Those were his last words. I
heard another shot, and rushed back thinking that old man
Chitwood had been shot. When the defendant came in the
electric lights of the town were off and the light was from
an oil lamp. The defendant commanded me to keep my
hands off the lamp; at the time he had his right hand be-
hind him."

George Cook testified—

that they left the tailor shop about 11:30; that he and
Mearle Chitwood, preceding the others, stopped at the
First National Bank corner, where they remained about
half an hour; that he heard the deceased say that he had
got into a fight with Hugh, and the defendant walked up
and said something to Mearle Chitwood, and struck him,
then Mearle knocked the defendant down. "Then both the
boys picked up bricks, and I told the defendant to go on.
I picked up the defendant's hat, and went north with him
to the Glass Hotel, where I was staying, and the defend-
ant went on saying something about getting a gun and com-
ing back to kill both of them. I saw the defendant take
two drinks, and saw Mearle Chitwood take one. Didn't
see the deceased drink any whisky at all. I know I was
not drunk on that occasion."

Witness Proctor testified:

"I arrived in Minco on the south-bound train, and
went west on the north side of Main street. I saw a man
come down the street who stopped at the corner of the
First National Bank a few minutes, and moved on a little
further and stopped again. He was going west towards
Chitwood's barber shop, and I heard the shooting a few
minutes afterwards."

Paul Glass testified—

that "I had been out in the country and got back to Minco
about 12 o'clock that night, and saw the defendant go north

from the bank with George Cook, and the defendant had his hat on;" that later he heard the shots, and would say they were about ten seconds apart.

Mrs. Chitwood, the mother of the deceased, testified—that her home was about three blocks north of the First National Bank, and defendant came there that night and called her husband, and she heard him say that he had cut one of the boys to pieces and was going to cut the other one, and then her husband left.

Mearle Chitwood testified:

"I left the tailor shop with George Cook and we stopped at the bank corner. Then Marvin and Jim Dunaway came, and Marvin said he had a fight with the defendant. The defendant came up with a knife in his hand and struck at me, and I hit him and knocked him down, and I found the defendant had cut my leg. We went to the barber shop to dress my wounds. While there my father came in, and shortly the defendant came in and said, 'I have been out there listening to you damn sons of bitches, and heard what you have been talking about, and now I have got them two Chitwood boys.' I started to raise up, and the defendant told me to sit down. Then my father grabbed the defendant around the waist and he backed off a little and shot."

Len Chitwood testified:

"I am the father of Marvin and Mearle Chitwood. The defendant came up to my house that night about 12 o'clock. I had retired. He called me. I knew his voice, and wondered what he wanted. He said he wanted me to come down and take care of my boys; that he had cut them bad; that he did not know which one he cut as the two were so much alike, but said he was going to get the other one; that he was going home to get his gun, and when I heard his target go off I might know what had happened. I dressed and went to the barber shop, and the boys were there with a coal oil lamp. Marvin was trying to dress a knife cut on Mearle's leg. The defendant came

in and said: 'I have been listening to you damn sons of bitches, and now I have got you all here in a pile.' The defendant ordered Jim Dunaway to leave the lamp alone. He then walked toward us with his gun in his hand and told me to step aside. I talked to him and asked him to let things be as they were and there would be no trouble. I then grabbed him around the waist so he could not shoot, as I thought, and was trying to get him out of the door when he shot. After the first shot I caught the gun, but he held it and fired again. I have known him since he was a small boy."

For the defense six character witnesses testified as to the previous good character of the defendant in the community for being a peaceable law-abiding citizen.

The defendant, as a witness in his own behalf, testified—

that he was 23 years old. Had lived in Minco practically all his life, and had known the Chitwood boys practically all their lives, "and our relations were friendly." "On the night of the homicide I was at Rice's tailor shop with the Rice boys, Chitwood boys, Jim Dunaway, and another boy who I did not know. We were playing and singing and drinking whisky. When we left the shop one of the Chitwood boys locked the door and left the Rice boys in there. I said, 'Wait a minute, had we better get those boys out so they can go home?' and the Chitwood boy said, 'It's locked now; if you get in you will have to break in;' and started to cursing me. I laughed at him and slapped him on the shoulder, and said, 'That was all right.' Then we got on the sidewalk, and he hit at me and missed me, and I didn't make any effort to hit him. Then he hit me in the mouth, and we scuffled around the street a little bit, and that was all. He went towards the First National Bank, and Dunaway and I went there, too. There we saw one of the Chitwood boys and George Cook. Mearle Chitwood said, 'Hugh, what did you jump on Marvin for?' and before I had time to explain I landed in the street, knocked down,

and Mearle Chitwood jumped astride of me. I had a pocketknife in my hand, and I was trimming my fingernail at the time, and when I was knocked down the knife hung in his clothes, but I did not know for sure that I had cut him. We had another little scuffle in front of the hardware store between the barber shop and bank. I had gone up there with George Cook to get my hat. Then we walked north to the hotel, and I went up to Mr. Chitwood's house and called him out. I told him his boys were down there, and were not taking care of themselves, and that we had had a fight; that one of the boys was cut; that I did not know which for sure; and he told me not to go down there until he got there. I told him that I was going to get my hat, but didn't tell him that I was going to get my gun and come down there and kill them. I already had my gun. I then went to the Glass Hotel, looking for Mr. Cook, and sat down and waited until Mr. Chitwood had gone down to the barber shop. Then I went down there and got my hat, and then walked up on the sidewalk in front of the barber shop, and saw Mr. Chitwood and the boys in the shop and also Jim Dunaway. I went in and walked between the mirror and the two barber chairs. Dunaway started to get up and turn the light down, and I thought he was going to blow it out. Mearle Chitwood got up and started around behind me, I supposed to get a razor, and I pulled the gun out of my pocket and threw it on Chitwood, but made no effort to shoot him. Then old man Chitwood grabbed me. Old man Chitwood started to talk to me, and then threw his arms around me and held me tight, and rushed forward with me towards the door, and he was making efforts to get my gun, and we struck the window and broke it. About that time the gun went off. I didn't shoot. I could not see either of the Chitwood boys at the time. We scuffled over the gun until we got outside, and it was fired again, but he had hold of it at that time and I had no intention to fire it. After the second shot we got loose from each other, and I supposed that I had shot Mr. Chitwood. I ran to Dr. Hune's office, some one hundred and fifty feet. When

I got there I told Dr. Hune to come and see about Mr. Chitwood, that we had trouble, and I was afraid he was shot. The pistol shown me here is the one I had. It is an automatic Colts. I didn't tell witness Cook that I was going to get my gun. I don't make it a practice to carry a pistol."

In rebuttal Roscoe Simpson testified:

"I am in the telephone business at Minco. I saw the defendant with his father on the street just after the killing. I heard the defendant say to his father, brother, and others that he did it in self-defense. I don't know whether he had reference to the cutting or the shooting."

*J. B. Pope* and *Riddle & Hammerly,* for plaintiff in error.

The Attorney General and *R. McMillan,* Asst. Atty. Gen., for the State.

DOYLE, P. J. (after stating the facts as above). This appeal is prosecuted from a judgment of conviction rendered in the district court of Grady county on the 5th day of February, 1916, in pursuance of the verdict finding the defendant guilty of manslaughter in the first degree, and fixing his punishment at imprisonment in the penitentiary for a term of four years.

The first assignment of error is that the verdict is contrary to and unsupported by the evidence. It is contended under this assignment that the evidence shows that defendant believed the deceased started to arm himself with a razor for the purpose of assaulting the defendant, and that he pulled his gun to prevent him from so arming himself; that in the scuffle with the father of the deceased the gun, an automatic pistol, was discharged accidentally; that at the time of the discharge the defendant, struggling with the father of the deceased, was unable to see

the deceased or know where he was. We deem it sufficient to say that in our opinion the evidence in the case tended strongly to prove that the killing was premeditated and deliberate, and was amply sufficient to support a verdict of murder. The defendant was an armed trespasser, and had within the hour preceding assaulted the deceased and had cut his brother with a knife. His evidence fails to show what other purpose he had in entering the barber shop at the time he fired the fatal shot. Fortunately for the defendant, the jury, in mercy or in a mistaken view of the law or the facts, found him guilty of manslaughter in the first degree. This the jury had a right to do.

The next error assigned is that the court erred in overruling the defendant's challenge to the juror Bouleware. From the examination of this juror it appeared that he had heard the case discussed by neighbors, who knew nothing about the case except by hearsay; that he had expressed an opinion about the case, but had no opinion at that time as to the guilt or innocence of the defendant; that he could disregard that opinion, and try the case solely under the evidence as presented.

We are of the opinion that there was no error in overruling the challenge. In the case of *Gentry v. State*, 11 Okla. Cr. 355, 146 Pac. 719, it is said:

"Under our statute, the mere expression of an opinion by a juror in common conversation, without anything to show ill will, hostility, or a fixed determination of belief, is not a legal ground of challenge for cause. In order to disqualify the juror there must be 'the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging.' Section 5858, Rev. Laws 1910.

"The issues raised upon a challenge for cause to a juror in a criminal case, on the ground that he has formed an opinion founded upon rumor, statements in public journals, or common notoriety, and upon which he has expressed an opinion, is one of mixed law and fact; and the finding of the trial court upon the issue ought not to be set aside by a reviewing court, unless it appears that upon the evidence the trial court ought to have found that the juror had formed such an opinion that he could not in law be deemed impartial."

The third assignment is that the court erred in refusing to permit the witness Dr. Hune to testify as to what the defendant said to him immediately after the homicide when the defendant went to his office. The record shows that Dr. Hune, a witness for the defendant, testified that his office is about 150 or 200 feet from the Chitwood barber shop; that he was in bed in his office the night Marvin Chitwood was killed, and heard a shot between 12:30 and 1 o'clock, and two or three minutes later the defendant came up the stairs to his office. He was then asked to state what, if anything, the defendant said. The court sustained an objection that the same was incompetent. Counsel for the defendant stated that "we expect to show by this witness that the defendant Pope, when he came to his office, said that he had better go down to the barber shop, that he thought some of them were badly hurt, as they had been in a scuffle and his pistol was accidentally discharged and he thought Chitwood was shot." We think the court properly rejected the testimony offered on the ground that the statements of the defendant to Dr. Hune formed no part of the *res gestae,* were self-serving, and incompetent for any purpose. The testimony was, therefore, inadmissible. See *Gransden v. State,* 12 Okla. Cr. 417, 158 Pac. 157.

The fourth assignment is that "the court erred in permitting counsel for the state to inquire of certain

character witnesses about alleged difficulties and threats made by the defendant on other occasions and concerning other parties and arguing the same to the jury as a fact proven." It appears that G. W. Stevenson, the first character witness called, testified to the defendant's good character for peace and quiet. His cross-examination was in part as follows:

"Q. Did any one ever tell you about Hugh Pope drawing a gun on Daniel Froneberger and threatening to kill him? A. Not prior to this trouble. Q. But since this trouble you have heard about it? A. I didn't hear any of the particulars about it; I just heard it referred to. Q. At the time of this killing had you heard about Hugh Pope pulling a gun on Fred Scroggins and making him get up one night and build a fire? A. No, sir. Q. Do you know Harold Smith, a little boy fourteen or fifteen years old? A. I do not know him by his name. Q. Did you ever hear about Hugh Pope pulling a gun on that little boy and making him dance down at the wagon yard there? A. No, sir. Q. Do you know Jack Abram? A. Yes, sir. Q. Did you ever hear of Hugh Pope pulling a gun on him between Minco and El Reno and threatening to kill him? A. No, sir. Q. None of these occurrences you have heard about except the one with the Froneberger boy? A. I have heard something of it since the occurrence. Q. You have heard all of these things since the killing occurred? A. Yes, sir; most of them. Mr. Riddle: We move to strike out the testimony as assuming a state of facts not in the record, incompetent, irrelevant, and immaterial. Overruled by the court. Exceptions allowed."

Other character witnesses were asked the same questions on cross-examination, and two or three stated that since the homicide they had heard such reports.

As a general rule a witness to good character may be asked on cross-examination whether he has heard rumors of particular and specific charges of the commission of

acts inconsistent with the character which he was called to prove, and generally as to the grounds of his evidence, not so much to establish the truth of such facts or charges as to test his credibility and to determine the weight of his evidence. He may be asked if he has not heard some general report which contradicts the good report which he has been called upon to prove. Underhill, Crim. Ev. par. 82; *Stouse v. State*, 6 Okla. Cr. 415, 119 Pac. 271. However, evidence of bad character must refer to a period prior to the discovery of the crime, and ordinarily such reports, to be admissible, must be confined to a time previous to the commission of the crime charged. We think the cross-examination of the character witnesses was proper. It appears that these witnesses qualified their answers by stating that they had heard such reports since the homicide occurred, and for this reason the motion to "strike out" this testimony should have been sustained. However, on the undisputed facts of this case, we cannot regard this error as a sufficient cause for a reversal.

In support of one of the grounds for new trial affidavits of the defendant and his counsel were filed to the effect that counsel for the state, in the closing argument to the jury, stated, in substance, that certain character witnesses had not heard of the gun plays on the part of the defendant until after the homicide, and that had they known of such gun plays their testimony would have been different; that objection was made, and defendant's counsel called for the court reporter, which was granted. Alleged improper remarks made by the prosecuting attorney in his argument to the jury must be incorporated in the case made by transcript or by bill of exceptions allowed and certified by the trial judge before they can be considered on appeal. Such remarks cannot be presented by

affidavit or in any other manner, unless it appears from the record that counsel for the defendant requested the trial judge to have such remarks taken down by the stenographer in order that they might be incorporated in the record, and the court refused to have this done. Upon the record in this case there is nothing properly before the court to act upon.

Several assignments are based upon objections made and exceptions taken to the instructions given submitting the defense that the shooting was accidental. It would subserve no good purpose to review them at length, as the evidence is undisputed and the defendant admits that after he assaulted the deceased on the street, and after he had stabbed the brother of the deceased, he returned and entered the barber shop of the father of the deceased armed with a pistol; that he then committed an assault upon one Dunaway, and also upon the brother of the deceased, by drawing a pistol upon them. Thus from his own testimony it appears that he was engaged in the commission of a misdemeanor at least, when he fired the fatal shot, and that the homicide was manslaughter in the first degree at least, even though the shot that caused the death of Marvin Chitwood was accidental and unintentional, and for this reason the instructions objected to were far more favorable to the defendant than the law warrants.

Having considered all the assignments of error, and finding no error prejudicial to the substantial rights of the defendant, the judgment is affirmed.

ARMSTRONG and MATSON, JJ., concur.