## XENOPHON JONES v. STATE.

No. A-3458.   Opinion Filed July 10, 1920.

(190 Pac. 887.)

(Syllabus.)

1. **HOMICIDE—Evidence—Clothes of Deceased.** On a trial for murder by shooting, where the plea is self-defense, the clothing worn by decedent at the time he was shot, when identified, is admissible in evidence as tending to show the relative position of decedent and defendant at the time the shots were fired, and for the purpose of showing the location of the wounds.

2. **SAME—Exhibition of Clothes to Jury.** On a trial for murder it is not error to permit a witness to exhibit to the jury the clothes worn by decedent at the time he was shot, and to point out and demonstrate how the holes in the garments corresponded with the wounds in the body.

3. **WITNESSES—Cross-Examination—Character Witness.** A witness to good character may be asked on cross-examination whether he has heard rumors of particular and specific charges of the commission of acts inconsistent with the character which he was called to prove. This is admissible, not for the purpose of establishing the truth of such reports, but to test the credibility of the witness, and to determine the weight of his evidence. However, such reports, to be admissible, must be confined to a time previous to the commission of the crime charged.

4. **HOMICIDE—View of Premises—Discretion of Court—Review.** Where, in a trial for murder, a view of the place where the of-

fense charged was committed is directed by the court upon the request of the county attorney under section 5897, Rev. Laws 1910, providing that "when, in the opinion of the court, it is proper that the jury should view the place in which the offense was charged to have been committed, or in which any other material fact occurred, it may order the jury to be conducted in a body," etc., the action of the trial court will not be reviewed by this court, unless it is made to appear that the court acted arbitrarily and abused its discretion, under circumstances which tend reasonably to indicate that the substantial rights of defendant were prejudiced thereby.

5.  **TRIAL—Instructions—Sufficiency—Refusal of Requests.** The refusal to give requested instructions is not error, where those given fairly and fully present every phase of the case.

6.  **HOMICIDE—Manslaughter—Sufficiency of Evidence.** In a prosecution for murder, the evidence reviewed, and held amply sufficient to sustain the conviction for manslaughter in the first degree.

*Appeal from District Court, Muskogee County;*
*Chas. G. Watts, Judge.*

Xenophon Jones was convicted of manslanghter in the first degree, and he appeals.   Affirmed.

Under an indictment which charged him with the murder of Guy F. McIntyre, in Muskogee county, on or about the 30th day of October, 1917, Xenophon Jones was convicted of manslaughter in the first degree, and sentenced to serve a term of 25 years in the penitentiary.   The following is in substance the evidence in the case.

Dr. F. J. Wilkiemeyer testified:

That he was attending physician to Guy F. McIntyre, from October 30th until his death on November 8th; that he found an abdominal wound, which entered about an inch above the pubic bone, and a wound on the right leg just below the head of the femur, and in the back just under the left shoulder there was another gunshot wound; he identified the clothes worn by the deceased when he reached

him, and pointed out rents appearing in the clothing which corresponded with the wounds; that the gunshot wound in the abdomen, which punctured the intestines, was the cause of his death.

R. Y. Edwards testified:

That "I am connected with the Muskogee Tire Repair Company, doing business at 231 North Fourth street, Muskogee; Guy F. McIntyre was manager. Between 5 and 6 o'clock in the evening of October 30th, defendant, Jones, came to this place to get an automobile tire. Guy F. McIntyre was sitting at a desk in the front room. C. E. Airhart and George Smith, a colored man, were working in the next room. Defendant asked for the tire that he had left there. I said it must be in the next room. I went in there, and defendant followed me. I asked George Smith where the tire was, and he said 'Here it is.' I turned around and said, 'George will get your tire for you.' I stepped back into the front room. I heard the defendant say he didn't want that tire fixed that way. Mr. Airhart said: 'That is the only way it could be fixed and fixed right.' Defendant said: 'Of course you would say that. I didn't tell anybody to fix it that way, and I am not going to pay for it.' And he asked where the proprietor was, and either Airhart or Smith said: 'He is in the other room.' Defendant came back into the front room and, addressing McIntyre, said: 'I didn't tell you to fix that tire that way; I didn't want it fixed that way.' McIntyre said: 'I understood you to say you wanted it vulcanized.' Defendant said: 'You are a God damn liar; I didn't say any such thing.' McIntyre said: 'You can't talk that way in here; I will give you your tire and you can get out.' With that McIntyre got up from the desk and went back into the next room, and defendant followed him. I heard defendant remark to McIntyre that he would talk to him any damn way he pleased, and immediately I heard four shots in rapid succession. I rushed in between McIntyre and defendant, just as the last shot was fired. McIntyre reached for the

table and fell on the floor. McIntyre did not have anything in either hand, and was about six feet from defendant when he was shot. I said to defendant, 'Don't do that; don't shoot a man that way; it is an awful thing to shoot a man that way;' and he began to back out. When he got about in the middle of the front room, he turned and ran out the door, and across the street, and got into his automobile. A colored boy came into the front room with defendant and followed him out. The shooting occurred between 5:30 and 6 o'clock in the afternoon on the 30th day of October, 1917. I stepped to the phone and called Dr. Wilkiemeyer and called Mrs. McIntyre."

C. E. Airhart testified:

"I am an employe of the Muskogee Tire Repair Company and was working for this concern on the 30th day of October last; Guy F. McIntyre was manager. Mr. Edwards and George Smith, a negro boy, were working there at the time. I saw defendant enter. I was standing in front of the rack in the second room, sometimes called the middle room. Mr. Edwards came in there with him, and asked George Smith where was his tire. George pointed up to the tire, which was hanging on an arm, and said: 'Here it is; it is cut down and cemented; it will be out first thing in the morning. Defendant said: 'I did not want it repaired that way.' George said: 'Well, you will have to see the boss about that.' I told defendant that was the only practical way to repair the tire. He said he only wanted a puncture fixed and a boot put on. I told him it would not hold that way; it would have to be vulcanized to make it hold; and he said, 'Of course, you will say that; where is the proprietor?' I told him, 'In the front room.' He walked out. I heard him say, 'Who is the proprietor here?' Some one said, 'I am;' he said, 'I didn't want my tire vulcanized; just wanted the puncture fixed, and a boot put on it;' and the reply was, 'We understood you wanted it vulcanized.' Defendant said, 'You are a God damn liar; I didn't want it fixed that way.' The partition, 7 or 8 feet high, extends

half way up to the ceiling, and I could not see over it. As Mr. McIntyre walked in to the second room, he said, 'You can't talk to me like that in here; I will get your tire and you can get out.' Defendant said, 'I will talk to you as I God damn please;' he was just inside the door of the second room, and Mr. McIntyre was walking along by the work bench, with his back to defendant. McIntyre stopped and turned partially around, and defendant pulled an automatic pistol from his right hip pocket and fired four shots. McIntyre put his hands on his abdomen and fell to the floor. Defendant held his gun for a minute, and backed out of the room; turned, and ran out and jumped in his car, and drove off. Barnett, the colored boy who came in with him, followed and grabbed the car while it was in motion, and climbed in the back seat. McIntyre was about 8 feet ahead of the defendant when he was shot."

George Smith testified:

"I was working for the Muskogee Tire Repair Company. Xenophon Jones came there that evening to get his tire, or see about a tire, that he left there to be fixed. I was standing at the end of the work bench repairing a tube. Mr. Airhart was working at the bench. Mr. Edwards came in and asked me where Jones' tire was, and Xenophon spoke and said, 'I want to get my tire, George.' I said, 'It is all cut down and cemented, and will be out the first thing in the morning.' He said, 'I didn't order anything but the tube vulcanized and the boot put back over the hole.' I said, 'I don't know anything about that; you will have to see the boss.' The next thing I saw Xenophon was standing facing Mr. McIntyre, and I heard him remark, 'Ain't my word as good as yours?' I went into the back room, and four shots were fired just as I went in the door. I came back, and saw Mr. McIntyre lying there on his side and holding his stomach; he told me to come and do something for him. Xenophon was backing out. Mr. Edwards was talking to him. I put my coat under Mr. McIntyre's head. A colored boy named Barnett came in

with Xenophon and was waiting for him in the front room."

On the part of the defense J. T. Lane testified:

"I run a barber shop; during the noon hour I went to the Muskogee Tire & Repair Shop, and made an examination on the inside partition of the second room, and found two indentures in the wall, about five feet above the floor, near the jamb of the door. I picked up a piece of iron from the table and fitted it in these indentures, and it seemed to fit perfectly. Mr. Crump was with me."

Charley Kimsey testified:

"I visited the Muskogee Tire & Repair Shop this morning, and made an examination of the partition wall, and observed a dent there, and a piece of iron that was there; it fitted the dent in the wall. Judge Leahy pointed the dent out to me."

J. P. (Creek) Barnett testified:

"I am a Creek Freedman; my age is 22 years. I went to the tire shop with Xenophon Jones. I heard George Smith say to Xenophon, 'You will have to go to the front and see the boss.' Xenophon came back into the front room and asked for the boss. Mr. McIntyre said: 'It makes not a damn to you who is boss here; what are you raising all of that hell back there for?' Xenophon said: 'I was not raising any hell back there; I told George that I ordered my tube vulcanized and not my casing.' Mr. McIntyre says, 'You are a damn liar; you didn't tell me any such thing;' and he jumped up and said, 'I want you to get that tire, and get out damn quick, before I kick you out.' Xenophon walked in to the second room, and Mr. McIntyre rushed on through. Xenophon says, 'Can't you be a damn liar as well as I; ain't my word as good as yours;' and Mr. McIntyre reached under the table and at the same time says, 'What do you mean by calling me a damn liar,' and came back and struck at Xenophon with an iron of some

kind 2½ feet long, and the iron went over his head and hit the wall; at the same time Mr. McIntyre hit Xenophon with his left hand; Xenophon pushed him back, and I heard the shots. This all occurred in 30 seconds; Xenophon turnéd and walked out to his automobile. He says, 'Come on,' and I followed and jumped on the running board and he drove home."

As a witness in his own behalf Xenophon Jones testified:

"I live in Muskogee; I will be 17 years old next month. I am on the Creek Freedman roll. Between 12 and 1 o'clock that day I took an inner tube to the repair shop on North Fourth street to be repaired, and left it with the gentleman I later had trouble with; when I had the puncture, I wanted this colored boy George to fix it, and I came there. I told this man I wanted to get this tube repaired, and asked him what time he could get it out. He said 'About 4 or 5 o'clock.' I went back there with this colored boy, J. P. (Creek) Barnett. On the way I stopped at home to get my sweater, and my mother told me to bring the pistol back to the barn. It was my uncle's 32 automatic pistol. I then went to the Muskogee Tire & Repair shop. George Smith was at the work table in the second room, and I said to him, 'I want to get my tire, George;' and he said, 'It is not ready; it is on the drying rack;' and he reached up to get it down, and there were two blocks of wood on the inside of the casing, and some kind of sticky substance on the tire, and I said I didn't want the casing vulcanized; I only wanted the tube fixed, and he said, 'This is the order we got from the boss; you will have to see the boss.' I turned around, and went into the office, and said: 'Which one of you gentlemen is the boss;' and one of the gentlemen sitting at the desk looked at me and said, 'What the hell difference does it make to you who is the boss?' and 'Why are you raising all that hell back there?' I says, 'I beg your pardon, I was not raising any hell;' and he said, 'You know damn well you wanted that casing fixed.' I said, 'No sir; you are mistaken.' He said,

'You are a damn liar, and you know damn well you told me you wanted that casing fixed.' I said, 'No, sir; you are mistaken; ain't my word as good as yours?' He said, 'No, it is not; you are a damn liar, and don't you say another damn word while you are in here, and you get that tire and get it out before I kick you out.' When he said that, I stepped inside of the door, and he came by me and started on towards this table; he passed me, cursing and calling me a damn liar, and a damn black son of a bitch; that I knew damn well I wanted that casing fixed, and if I said anything else about my word being good as his he would knock my damn brains out. I said, 'I hope I don't have to be all that because you made a mistake in vulcanizing my casing;' and I said, 'Can't you be a damn liar as well as I can?' and he said, 'No, you God damn little black son of a bitch;' and he grabbed something off the table. I said, 'Don't you hit me!' and he rushed onto me and hit at me with it. I dodged it, and it hit the wall over me, and he hit me along my right cheek with his left fist. I shoved him back, and pulled out the pistol, and as I got it out it went off, and he rushed on me again, and I fired three shots as fast as I could fire, and he fell on the floor. I turned around and walked out and got into my car. Barnett was standing on the curb, and I said, 'Come on, J. C., and get in the car.' "

Johnnie Myers testified:

"I am a Creek Freedman. Xenophon Jones came to my place the night Mr. McIntyre is said to have been shot, and he had a bruise about the size of a nickel on his face that evening."

Mattie Myers testified:

"Xenophon Jones came to my place that night about 10 or 11 o'clock, and on the side of his face was a scratch or bruise about the size of a quarter."

Thomas W. Leahy testified:

"I was called in this case the night of the shooting, and went to Johnnie Myers' house the morning after the shooting, to bring defendant to Muskogee and deliver him over to the sheriff. I observed a bruise on his right cheek, probably about the size of a quarter."

Several witnesses testified that they were acquainted with the general reputation of the deceased as to being a quarrelsome, contentious, and overbearing man, and it was bad. Several witnesses testified that they were acquainted with the general reputation of defendant as to being peaceable, quiet, and law-abiding, and that reputation was good.

In rebuttal Kelly Brown, J. A. Barbre, and Chas. B. Law testified that at the noon hour they visited the place of business of the Muskogee Tire & Repair Company, and examined the indentations on the partition between the front and middle rooms; that there were two dents, one was more like a scratch, and the other, three or four inches from it, was the depth of the thickness of a sheet of paper; that they placed the piece of iron which was introduced in evidence thereon, and it did not fit the dents. One dent was nearly twice the width of the same, and the other was about a quarter of a inch wider.

Several witnesses testified that they well knew the reputation of the deceased as to being a peaceable, quiet, and law-abiding citizen, and that it was good.

*Thomas W. Leahy, S. M. Rutherford,* and *W. J. Crump,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *W. C. Hall,* Asst. Atty. Gen., for the State.

DOYLE, P. J. (after stating the facts as above). Xenophon Jones was indicted in the district court of Muskogee

county for murder, and upon his trial the jury returned a verdict finding him guilty of manslaughter in the first degree, leaving the punishment to the court. On March 20, 1918, the court rendered judgment and sentenced him to imprisonment in the penitentiary for a term of 25 years. To reverse the judgment he prosecutes this appeal.

It appears that deceased, Guy F. McIntyre, was a resident of Muskogee; he was a young man with a family, consisting of a wife and two children. Defendant, Jones, a negro boy, lived with his parents in Muskogee. The difficulty which resulted in the tragedy arose between the deceased, who was manager of the Muskogee Tire Repair Company, and defendant, over the repair of an automobile tire. Defendant shot deceased three times with a 32-caliber automatic pistol. One shot took effect in the back, another in the hip, and another took effect in the abdomen, which proved fatal. The theory of the state was that it was an unprovoked killing. Defendant's evidence suggests the theory of self-defense.

The first assignment of error necessary to notice is that the court erred in permitting the witness Dr. Wilkiemeyer to testify that the wounds in the body of deceased corresponded to the holes in the clothing of deceased introduced in evidence, and in placing said clothing upon the back of another, and pointing out and demonstrating how the holes in the garments corresponded to the wounds in the body. It is urged that this was demonstrative testimony, and that there was lacking evidence of the size of the deceased in comparison to the size of the person on whose back the clothing was placed.

It is the settled rule in this state that on a trial for murder, where the plea is self-defense, the clothing worn

by the deceased at the time of the homicide, and which shows the point of entrance of the bullets, is admissible in evidence, for the purpose of showing the location of the wounds, and to enable the jury to form an estimate of the relative position of the parties when the shots were fired. In the case of *Saunders v. State*, 4 Okla. Cr. 264, 111 Pac. 965, Ann. Cas. 1912B, 766, it is held that a coat worn by deceased at the time of the homicide, and which showed the point of entrance of the fatal bullet, was admissible in evidence. In the opinion it is said:

"The coroner, who was also a physician, testified that one bullet entered about six inches below the angle of the scapula, and about four inches to the right of the spine; the other wound was in the buttock. The garments were competent in corroboration of this evidence, and for the purpose of showing exactly what was inexactly stated. Nor is the state required in such cases to stand on the oral testimony of one or two witnesses, without supporting their testimony by demonstrative evidence; nor can the state be precluded from offering such evidence by a general statement, made by the defendant's attorney in objecting to the evidence, that 'there has been no dispute raised as to the mortality or location of the wounds.'"

And see *Burton v. State*, 16 Okla. Cr. 602, 185 Pac. 842; *Brantley v. State*, 15 Okla. Cr. 6, 175 Pac. 51.

The next assignment is:

"Misconduct on the part of P. A. Gavin, special counsel for the state, in the cross-examination of Mrs. J. A. Green, who as a character witness testified to defendant's good reputation as to being peaceable, quiet, and law-abiding."

On her cross-examination this witness was asked:

"Question by Mr. Gavin: Well, did you ever discuss about defendant having had a fight up here with a negro

in a garage, in which he pulled a gun on him? (Defendant objects as incompetent, irrelevant, and immaterial, and not proper cross-examination.)

"The Court: Sustained.

"By Mr. Gavin: Have you ever heard of that circumstance? (Same objection.)

"The Court: That would not disprove what she has testified to; the specific act does not constitute one's general reputation.

"Mr. McGinnis: This is to test the knowledge of the witness of the matters about which she offers testimony.

"The Court: I don't see that it is competent. Objection sustained."

The question involved has heretofore been decided by this court in *Pope v. State,* 15 Okla. Cr. 162, 175 Pac. 727. It was there held that:

"A witness to good character may be asked on cross-examination whether he had heard rumors of particular and specific charges of the commission of acts inconsistent with the character which he was called to prove. This is admissible, not for the purpose of establishing the truth of such reports, but to test the credibility of the witness and to determine the weight of his evidence."

And see *Stouse v. State,* 6 Okla. Cr. 415, 119 Pac. 271; *Russell v. State,* 17 Okla. Cr. 167, 194 Pac. 242; Underhill, Crim Ev. par. 82.

We think the cross-examination of this character witness was proper, and that the court erred in favor of defendant in sustaining the objection made.

Another assignment of error is that the court erred in permitting the jury, over the objection and exception of defendant, to visit the scene of the difficulty and examine

and view the marks or indentations on the wall, about which testimony had been given. Our Code of Criminal Procedure (section 5897, Rev. Laws 1910) reads as follows:

"When, in the opinion of the court, it is proper that the jury should view the place in which the offense was charged to have been committed, or in which any other material fact occurred, it may order the jury to be conducted in a body, in the custody of proper officers, to the place, which must be shown to them by a person appointed by the court for that purpose, and the officers must be sworn to suffer no person to speak to or communicate with the jury, nor to do so themselves, on any subject connected with the trial, and to return them into court without unnecessary delay, or at a specified time."

It appears from the record that in the course of the trial the county attorney requested the court that in the manner prescribed by law the jury be sent to view the place where the offense was committed and to view the indentations on the partition about which testimony had been offered. Defendant objected, for the reason that the room where the homicide was committed had been changed since the shooting, which objection was overruled, and exception allowed. The action of the trial court in permitting a trial jury to view the scene of a homicide will not be disturbed by this court, unless it is made to appear that such court acted arbitrarily and abused its discretion, under circumstances which tend reasonably to indicate that the substantial rights of defendant were prejudiced thereby. *Starr v. State,* 5 Okla. Cr. 440, 115 Pac. 356; *Seigler v. State,* 11 Okla. Cr. 131, 145 Pac. 308. It was the privilege of the defendant and his counsel to accompany the jury, and we presume they did so. If they did not, the privilege was waived.

We find nothing in the record that tends to show that the court abused its discretion in overruling defendant's objections.

Other errors assigned are based on exceptions taken to certain instructions given and to the refusal of the court to give instructions requested. The court, among other instructions, gave the following:

"(13) You are further instructed that evidence has been introduced to the effect that the deceased in his lifetime bore a general reputation as being a man of a quarrelsome, contentious, and overbearing disposition, and that the defendant, prior to the fatal difficulty, bore a general reputation as a peaceful, quiet, and law-abiding man. You are therefore instructed that this evidence is competent and proper, tending to show who was the probable aggressor at the time of the fatal difficulty."

(Given, and excepted to by defendant. Chas. G. Watts, Judge.)

The court then refused the following instruction, asked by defendant:

"You are instructed that the defendant has introduced proof to the effect that he has always had the reputation of being a peaceable, quiet, respectful, law-abiding boy, and you are instructed that such evidence is proper for your consideration, together with all the other evidence in the case, and should be considered by you in determining the guilt or innocence of the defendant, and as to who was probably the aggressor in the difficulty."

Thus it appears the requested instruction was substantially embodied in the instruction given, and defendant had the full benefit of the principle involved. The court, therefore, committed no error in refusing to repeat it. Taken as a whole, the instructions given covered

every phase of the case, and were more favorable to defendant than he had any legal right to demand.

One of the grounds of the motion for new trial, and which is assigned as error, is newly discovered evidence to the effect that the mark or indentation on the wall, about which testimony was given, was tampered with after having been examined by defendant's witnesses, and before it was viewed by the jury. The affidavits filed by defendant in support of his motion for a new trial are to the effect that the indentations were tampered with, in that they had the appearance of having been rubbed over, which indicated a difference in the original depth of one thirty-second of an inch. There is nothing to show that they were tampered with before the verdict in this case was returned, and the motion for new trial was properly overruled.

Upon the merits, the evidence for the state establishes an unprovoked murder, and as to defendant's testimony in support of the self-defense theory the proof was overwhelmingly the other way. In our view, the jury were exceedingly lenient under the circumstances in fixing the degree of the crime. As shown by the record, defendant has had a fair and impartial trial under the laws of the state.

The judgment of the lower court is therefore affirmed.

ARMSTRONG and MATSON, JJ., concur.