## JOHN DOBBS v. STATE.

No. A-6264. Opinion Filed March 26, 1928.

(264 Pac. 661.)

I. C. Sprague, for plaintiff in error.

Edwin Dabney, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DOYLE, P. J. The information in this case charged John Dobbs and Lev Dobbs with the murder of one Make Brodie, alleged to have been committed in McCurtain county on or about the 25th day of July, 1925, by cutting and stabbing him with a knife. There was a severance of trial asked for and granted.

On his trial appellant, John Dobbs, was convicted of murder and his punishment fixed by the jury at life imprisonment. A motion for new trial was duly filed and overruled, and judgment rendered in accordance with the verdict. From the judgment he appeals.

It is contended in this court that the evidence did not warrant the verdict, and that numerous errors were committed upon the trial, which entitled him to a reversal of the judgment.

The following brief statement of the facts will be sufficient to make clear the contentions made:

Appellant, 20 years of age, lived with his father and codefendant six or seven miles north of the town of Valliant; the deceased, Make Brodie, aged about 50 years, lived in the same neighborhood. He left his home on the morning of the 25th day of July in a wagon, accompanied by his son, 9 years old, to go to Valliant. When they passed the home of the defendants, Lev Dobbs was standing on the porch, and appellant was driving up some horses; overtaking George Collins, the deceased invited him to ride. Shortly after, appellant and his father passed them on the road; they were riding horseback. Brazil Burton, 14 years old, was riding on

the same horse with appellant. After passing the wagon of the deceased, the defendant stopped by the side of the road, and appellant started to fix the saddle girth on his father's horse. When the deceased came by, appellant spoke to him and an altercation started.

Jim Brodie, son of the deceased, 9 years old testified: That when the wagon stopped Mr. Collins got out. John Dobbs came up to the wagon and said he heard my father had been telling around that he whipped him at the schoolhouse and his father would not own up to it. Then John Dobbs picked up a rock and threw it at his father, and his father got out of the wagon, and John Dobbs cut him with a knife.

George Collins testified: That when the wagon was passing the defendants John Dobbs motioned to witness to get out, and he jumped out. Then Lev Dobbs said to his son John, "Now, John, stop him, stop him, get him out;" and John Dobbs hollered "Hey, Brodie, hold up there, stop, I heard that you were going to whip me; now is the time to do it." Mr. Brodie said, "I never said I was going to whip you, and I don't want any trouble." Then witness crossed the fence and turned and saw John Dobbs "make a throw," and witness went on.

The evidence further shows that the deceased had a wound between the second and the third rib and another wound two inches to the left of that, between the third and fourth rib, and that his death occurred in a few minutes after he fell.

Jack Harbin testified for the defense, and the substance of his testimony was to the effect; That he was driving to Valliant, and saw Lev and John Dobbs pass a wagon, and after going about a quarter of a mile they stopped by the roadside under the shade of a tree. That in the wagon were Make Brodie, his little boy, and George Collins. That when the wagon stopped George

Collins got out. That witness was then 150 yards behind the wagon, and saw John Dobbs pick up something about the size of his fist, and he started to throw. Then Lev Dobbs put his hand up, and John Dobbs dropped the rock. Then John picked up the rock and threw it at Mr. Brodie, and Mr. Brodie got out of the wagon, and they began to fight. Witness was then about 60 yards behind the wagon. That John Dobbs was backing up, and Mr. Brodie was following. Then Mr. Brodie threw up his arms, staggered, and fell. John Dobbs turned away, and got on his horse, and witness came up and carried Mr. Brodie under the shade of the tree. That he did not see any knife in Mr. Brodie's hand, and did not see any knife on the ground.

Brazil Burton testified: That after they passed Mr. Brodie's wagon his uncle Lev Dobbs stopped to fix his saddle girth. That while there Mr. Brodie's wagon passed them. That John Dobbs said, "I want to see that fellow;" and when the wagon stopped George Collins got out, and John Dobbs walked up to the wagon and said to Mr. Brodie, "I want to see you a minute." That he saw John throw something at the wagon before Mr. Brodie got out.

Lev Dobbs testified: That he and his son John started on horseback to Valliant, and they passed Mr. Brodie's wagon, then stopped in the shade of a tree to fix his saddle girth. When the wagon came up, George Collins jumped out and ran past him and said, "I don't believe I would have any trouble with him." Then Mr. Brodie threw his line down and said, "Now is as good a time as I will ever get." That when Mr. Brodie started to get out of the wagon, his son John picked up a rock and said to Mr. Brodie, "Don't get out of that wagon;" and witness told his son to drop that rock, and said to Mr. Brodie, "Go on, Mr. Brodie, go on." That Mr. Brodie jumped out of the wagon and advanced on his son with a

knife. That his son was backing up and fighting all the time. Then he saw Mr. Brodie fall. That his son John had a knife in his hand.

As a witness in his own behalf, appellant testified: That he had a difficulty with Mr. Brodie at the Lone Star schoolhouse, and later at the schoolhouse Mr. Brodie called him a liar and wanted to fight, and he told Mr. Brodie that he did not want to have to have any trouble with him, that he was not able to fight him, and Mr. Brodie said, "You are going to quit talking about me, if I hear any more of this, I will cut your damn head off." That he started to town that morning with his father. They passed Mr. Brodie's wagon and stopped in the shade of a tree to fix a saddle girth, when Mr. Brodie's wagon came by. George Collins jumped out and walked towards them and said, "I would not have any trouble with him;" then went on over the fence. That Mr. Brodie appeared to be very angry, and said, "Now is as good a time as I will ever have to get that damn son of a bitch." Then he picked up a rock and told Mr. Brodie not to get out of the wagon, and his father walked between him and the wagon and told him to throw down the rock, and said to Mr. Brodie, "Dont get out of the wagon." That Mr. Brodie started to jump out, and he again picked up the rock, then threw it, and Mr. Brodie struck at him with a knife and missed him, then struck him again, and the knife cut through his clothes and cut him on the shoulder. That he believed he was going to take his life, and he cut him as he went backwards from him. Then Mr. Brodie staggered and fell.

L. S. Cotteral testified that he assisted in putting the body of the deceased in the car, and saw eight or ten feet to the north of where the body was lying the handle of a broken knife.

In rebuttal, J. R. Jones, sheriff testified that he arrested appellant the day of the killing; that appellant

took off his shirt, and he examined him; that he had a scratched place on his arm that looked like where a pin had scratched him.

Against the objections of counsel for appellant, the trial court permitted the state to introduce in rebuttal the shirt worn by the deceased at the time he was cut and stabbed by appellant to show that the cut marks corresponded with the location of the wounds on the body of the deceased.

Bill Fowler testified that he helped to take off the shirt worn by the deceased at the time he was stabbed, and identified the shirt, and the same was produced before the jury for their inspection. Counsel for appellant objected, for the reason that the name of this witness was not endorsed on the information, and for the further reason that the state had closed its case and rested.

It is first contended that the trial court erred in admitting this evidence, and numerous authorities are cited to support this contention. Whatever the rule may be in other jurisdictions, it is settled in this state that on the trial for murder, where the plea is self-defense, clothing worn by decedent at the time of the homicide is admissible in evidence for the purpose of showing the location of the wounds. Saunders v. State, 4 Okla. Cr. 264, 111 P. 965, Ann. Cas. 1912B, 766, note; Morris v. State, 6 Okla. Cr. 29, 115 P. 1030; Brantley v. State, 15 Okla. Cr. 6, 175 P. 51; Jones v. State, 17 Okla. Cr. 561, 190 P. 887; Burton v. State, 16 Okla. Cr. 602, 185 P. 842.

This clothing was properly introduced in rebuttal, in that it clearly tended to rebut any inference arising from the defendant's own testimony that he acted in self-defense.

The state is not required to endorse the names of witnesses whose testimony is made permissible or neces-

sary in rebuttal by reason of the evidence of the defendant. Bigfeather v. State, 7 Okla. Cr. 364, 123 P. 1026.

It is next contended that the trial court erred in refusing to permit appellant to prove that at the Lone Star schoolhouse in June, before this tragedy in July, some relatives of the deceased made threats and demonstrations against appellant. The question argued is not presented by the record, and no offer as to what the witness would testify to was made.

The only other question argued by counsel is the sufficiency of the evidence to sustain the verdict of the jury. We have read the record with care, and we conclude that, when the jury had proceeded so far as to find the witnesses for the state worthy of belief, any other verdict other than the one returned would have been a reproach upon the administration of justice in the state.

Finding no prejudicial error in the record, the judgment of the trial court is affirmed.

EDWARDS and DAVENPORT, JJ., concur.